Raymond S. GILDERHUS, Individually, and Raymond S. Gilderhus, d/b/a Gilderhus Oil Company, Plaintiffs,

v.

AMOCO OIL COMPANY, a Maryland Corporation, Defendant.

Civ. No. 6–78–290.

United States District Court,
D. Minnesota,
Sixth Division.

June 15, 1979.

Patrick James Campbell, pro se.

Mike Greely, Atty. Gen., State of Montana, Helena, Mont., for defendant.

Steven C. Schroer, Faegre & Benson, Minneapolis, Minn., for plaintiffs.

Thomas C. Kayser, Robins, Davis & Lyons, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

The plaintiff herein is a "jobber" or franchisee for defendant Amoco Oil Company in the Moorhead, Minnesota area. This action was commenced in July of 1978, and is based on Amoco's refusal to sell plaintiff tires, batteries, and accessories for resale to plaintiff's customers, allegedly in violation of the parties' franchise agreement. During discovery Amoco discovered that plaintiff in the past has purchased non-Amoco oil products and resold them under the Amoco label. Upon learning this, Amoco immediately informed plaintiff that it was terminating plaintiff's franchise. Plaintiff now moves this court for a preliminary injunction, enjoining defendant from terminating the franchise. Plaintiff also has filed a supplemental complaint which alleges that the threatened termination is unlawful. Having heard the arguments and read the briefs and affidavits, this court grants plaintiff's motion for a preliminary injunction.

To resolve this motion properly we must determine the applicability of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–41. Subchapter I of the Act, §§ 2801–06, is entitled "Franchise Protec-tion," and it controls when a petroleum refiner, such as Amoco, can terminate a franchise with one of its distributors. The primary purpose of the Act is to protect petroleum franchisees from overbearing and discriminatory termination practices by franchisors. *See generally* S.Rep.No.95–731, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News, p. 873. The Act basically delineates the circumstances under which termination is permissible and the procedures a franchisor must follow to terminate a franchise. It also grants federal courts with jurisdiction over actions brought by franchisees for franchise terminations that allegedly violate the Act. Furthermore, and of significance here, the Act sets forth a preliminary injunction standard that is significantly more lenient than the general equity standards for preliminary injunctions.

### Applicability of the Act

Before analyzing the substantive provisions of the Petroleum Marketing Practices Act, the threshold issue of the Act's applicability to this franchise agreement must be addressed. The agreement at issue was executed prior to June 19, 1978, the effective date of the Act, although the termination occurred after that date. Section 2802(b)(1), which states the permissible grounds for termination, provides that "Any franchisor may terminate any franchise (entered into or renewed after June 19, 1978) or may fail to renew any franchise relationship, if . . . ." Since in this case the franchise was not entered into or renewed after June 19, 1978, it would appear that the provisions in the Act concerning termination do not apply. However, the above-quoted provision also addresses failure to renew a franchise relationship, without a limitation based on when that relationship commenced. Section 2801(14), in turn, defines the term "fail to renew" to include failure to "continue" a franchise relationship following a termination, on or after June 18, 1978, of a franchise that was entered into or last renewed prior to June 18, 1978. Thus, in an unusual, circuitous,

and complex fashion, the provisions of the Act do apply in cases such as the present one, where the franchise agreement is entered into prior to the Act's effective date but is terminated after the effective date.

### Preliminary Injunction Standard

■ Section 2805(b)(2) of the Act sets forth the following preliminary injunction standard:

> [T]he Court shall grant a preliminary injunction if—
>
> (A) the franchisee shows—
>
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
>
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

This statutory standard is patterned after the alternative general equity standard for preliminary injunctions that was promulgated by the Second Circuit and recently approved by the Eighth Circuit in *Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir.), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978). Both the statutory standard and the alternative equity standard require sufficiently serious questions going to the merits to make the case a fair one for litigation. Furthermore, both require a balancing of hardships. However, the alternative equity standard requires that the balance of hardships tip "decidedly" in favor of the party seeking the injunction, while the standard in the Act only requires that, on balance, the franchisee suffer comparatively greater hardship than the franchisor.

The legislative history of the Act indicates this divergence between the statute and the alternative equity test was intentional. The Senate Report makes clear that the statutory preliminary injunction test was designed generally to embrace the Second Circuit's alternative equity test. However, the committee also noted that the Second Circuit, in interpreting the alternative test, had recently held that the plaintiff must show extreme hardship, including irreparable injury. *Accord, e. g., Frejlack v. Butler*, 573 F.2d 1026, 1027 n.4 (8th Cir. 1978). The Senate committee then proceeded to clarify that such a showing was not required under the Act, but rather that "a balancing of the hardships requires the franchisee to show that the failure to grant the requested injunctive relief will cause the franchisee to suffer comparatively greater hardship." S.Rep.No.95–731, 95th Cong., 2d Sess. 41, *reprinted in* [1978] U.S. Code Cong. & Admin.News, pp. 873, 899.

It is evident, therefore, that under the Act the franchisee need not make a showing of either extreme hardship or irreparable injury. This is of peculiar significance in a franchise termination setting because courts often have held that a terminated franchisee does not suffer any irreparable harm, since he normally can be compensated for any losses through a monetary award. *See, e. g., Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 380 F.Supp. 441, 445 (S.D.N.Y.1974).

The Act's more liberal approach was implicitly recognized in the only case to date that has construed the preliminary injunction test of the Petroleum Marketing Practices Act, *Saad v. Shell Oil Co.*, 460 F.Supp. 114 (E.D.Mich.1978). In *Saad* the court, without elaboration, held that "the balance of hardships [clearly] falls on the franchisee," without finding that the franchisee would suffer irreparable harm. *Id.* at 116. Thus, this court need only consider whether the balance of hardships preponderates in favor of the franchisee, without reference to irreparable harm or extreme hardship.

### Serious Questions Going to the Merits

■ Having determined the meaning of the Act's preliminary injunctive standard,

the application of that standard is a relatively simple matter in this case. There can be little question but that the plaintiff has raised serious questions going to the merits. Although the plaintiff's actions in buying small quantities of petroleum products from sources other than Amoco technically were a breach of the franchise agreement, plaintiff has presented significant credible evidence that Amoco knew of this practice and in fact encouraged it. Thus, plaintiff has raised serious waiver and estoppel issues. Also, significant legal issues are raised under the Petroleum Marketing Practices Act. The Act does permit termination of a franchise when the franchisee adulterates, mislabels, or misbrands motor fuels as plaintiff apparently did, but only if those acts were "wilful." 15 U.S.C. § 2802(c)(10). Moreover, the franchisor has the burden of proving wilfulness. *Id.* § 2805(c). The Act does not define the term "wilful," nor does the legislative history shed light on the term. However, it seems doubtful that the finder of fact would find plaintiff's transgressions wilful if, as he claims, he was unaware that his practices violated the franchise agreement and he was told by local Amoco agents that he could buy fuel products elsewhere when Amoco was unable to supply them. Thus there appears to be a serious question as to wilfulness.

Even assuming plaintiff's conduct was wilful, there nonetheless remain other serious questions going to the merits. It was quite clearly the intent of Congress, in enacting the Petroleum Marketing Practices Act, to protect franchisees from heavy-handed practices by oil companies. In particular, Congress was concerned with "arbitrary or discriminatory" termination practices by franchisors. S.Rep.No.95–731, *supra*, at 15, 18. Congress also undoubtedly intended to forbid terminations in retaliation against franchisees who attempted to enforce their rights under franchise agreements. *Cf. id.* at 18. Plaintiff has raised serious questions as to whether the termination in this case was both discriminatory and retaliatory. Plaintiff has presented evidence that other Amoco franchisees have, with Amoco's knowledge, purchased oil products from other suppliers and have not been terminated by Amoco. In addition, other franchisees apparently are normally given the opportunity by Amoco to correct their transgressions before they are terminated, while plaintiff was given no such opportunity. Thus, plaintiff has raised a substantial question as to whether Amoco's decision to terminate was an act of discrimination.

Plaintiff also has presented evidence indicating the termination was in retaliation for the lawsuit plaintiff commenced in 1978 for breach of the franchise agreement. The court finds it curious that plaintiff's transgressions were discovered by Amoco during a deposition of plaintiff in the initial lawsuit, where Amoco's counsel pursued the issue vigorously and apparently with aforethought, and that plaintiff was informed immediately that termination would probably be forthcoming. There is at least some inference from this that Amoco was motivated by retaliatory considerations and was simply looking for an excuse to terminate.

The court does not wish to suggest that Amoco in fact was acting in a discriminatory and retaliatory fashion when it terminated plaintiff, but only that plaintiff has raised a legitimate factual issue as to Amoco's true motivation. If plaintiff's assertions on these questions can be proved at trial, it is likely that the termination would be found invalid, since it would be contrary to the very purpose and policies of the Petroleum Marketing Practices Act: to provide franchisees with "meaningful protections from arbitrary or discriminatory terminations." S.Rep.No.95–731, *supra*, at 18, U.S.Code Cong. & Admin.News 1978, p. 877. Therefore, plaintiff has raised sufficiently serious questions going to the merits to make the case a fair one for litigation.

*Balance of Hardships*

Defendant asserts that the balance of hardships does not favor the plaintiff because it would have to continue supplying plaintiff with Amoco oil products under certain temporary regulations promulgated by the Department of Energy. See 10 C.F.R.

§ 211 (1978). Defendant also observes that it will suffer hardship if the termination is enjoined, since it has no assurance that plaintiff will abide by the contract and sell only Amoco oil products during the period the preliminary injunction is in effect. The court does not find these arguments convincing. While it appears to be true that Amoco must continue to supply plaintiff with petroleum products under the Department of Energy regulations, plaintiff would nonetheless suffer hardship if the franchise is terminated. This hardship would come from at least two sources. First, plaintiff would no longer be able to service customers who use Amoco credit cards, and those customers account for a large portion of plaintiff's business. Second, plaintiff could no longer use the Amoco trademark, with its attendant goodwill. Finally, any hardship Amoco might suffer can be minimized by requiring plaintiff, as a condition to the preliminary injunction, not to purchase petroleum products from sources other than Amoco. Therefore, this court finds that the balance of hardships tips toward the plaintiff.

The clerk is directed to enter a preliminary injunction enjoining Amoco from terminating plaintiff's franchise pending trial on the merits, that injunction conditioned upon plaintiff not purchasing petroleum products from suppliers other than Amoco. This memorandum and order shall constitute the court's findings of fact and conclusions of law.