**William C. BRACH, Plaintiff-Appellee, Cross-Appellant,**

**v.**

**AMOCO OIL COMPANY, a Maryland Corporation, Defendant-Appellant, Cross-Appellee.**

Nos. 80–2714, 80–2721.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1981.

Decided May 11, 1982.

1214

Jeffery M. Cross, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for defendant-appellant, cross-appellee.

William M. Doty, Jr., Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before BAUER and WOOD, Circuit Judges, and EVANS, District Judge.*

* The Honorable Terence T. Evans, District Judge from the Eastern District of Wisconsin, is sitting by designation.

HARLINGTON WOOD, Jr., Circuit Judge.

The district court below granted plaintiff Brach's motion for summary judgment on the issue of wrongful nonrenewal of his franchise relationship with defendant Amoco Oil Co. ("Amoco") under Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806 (Supp. III 1979), and his motion to dismiss Amoco's state counterclaim for lack of subject matter jurisdiction. The district court further granted Amoco's motion for summary judgment on the issues of Amoco's compliance with the PMPA notification requirements and of the availability of mandatory injunctive relief under the PMPA. Amoco appeals and Brach cross-appeals from those rulings. This appeal requires us to construe for the first time certain provisions of the PMPA.

## I. BACKGROUND

Commencing in 1963, Brach entered into a franchise arrangement with Exxon Company, U. S. A. ("Exxon") under a series of renewable one-year leases of certain retail service station premises in Winfield, Illinois. Exxon last renewed that franchise on November 1, 1976. In August 1977, Exxon transferred its interest in the premises to Amoco as part of a larger business transaction. Apparently, the upkeep of the service station and the profitability of the relationship did not meet Amoco's expectations. Amoco notified Brach that the present lease would not be renewed when it expired on November 1, 1977, but that it would be extended six months (to May 1, 1978) to allow Brach time to relocate his business provided he complied with certain conditions pertaining to maintenance and hours.

Brach continued his service station business, paying rent to Amoco, beyond the May 1, 1978 expiration date. On May 25, 1978, Amoco sent to Brach by certified mail the following letter:

Please refer to your lease covering subject premises dated 11/1/76, which expired on 11/1/77 and which has been held over on a month-to-month basis. The purpose of this letter is to inform you that we do not elect to continue the existing lease arrangement with you and hereby cancel said lease effective June 30, 1978.

When Brach had not vacated by late June, Amoco sent another letter advising Brach that gasoline deliveries would continue pursuant to Department of Energy regulations (10 C.F.R. § 211.9 (1980)), but that such deliveries would not constitute "a waiver of Amoco's demand for possession of the premises effective June 30th." According to Amoco, the profitability of Brach's franchise did not improve, and in August, Brach received a letter informing him of a rent increase. Later, however, Amoco rescinded that letter and continued to accept Brach's rent payments in the previously agreed amount.

In an apparent effort to make the relationship more profitable, Amoco entered into negotiations for the sale of the premises to Brach.[1] In August 1979, the negotiations culminated in a real estate contract under which Brach agreed to purchase the premises for $200,000, depositing $10,000 as earnest money. Amoco obtained the requisite title commitment and insurance and forwarded copies to Brach's attorney. Amoco later received a letter from Brach's attorney stating that Brach expected to complete negotiations for financing and to close the sale in about three weeks. After not hearing from Brach or his attorney for some time, Amoco again wrote to Brach's attorney informing him that Amoco was ready, willing, and able to close. As it turned out, Brach was unable to secure the necessary financing and in January 1980, informed Amoco that he would be unable to close the transaction.

---

1. Amoco conducted a profitability study of the service stations it had acquired from Exxon. That study used a "profitability index" ("PI") to rate the stations. A good PI, according to Amoco, would be somewhere around 10%. In 1979, Amoco calculated Brach's PI to be 3.2% or 5.6% with a rent increase. The study allegedly revealed that a sale of the premises to Brach would raise the PI to a healthy (i.e., profitable) 18.5%.

Shortly after learning of the default, Amoco notified Brach by certified letter of its intent permanently to close his account and that he had until May 31, 1980 to vacate the premises. Amoco enclosed a summary of Title I of the PMPA and told Brach that the reason for its decision was because he was "unable to purchase the premises as previously stipulated." In that letter, Amoco referred to the lease with Brach as "presently on a month-to-month basis."

On July 25, 1980, with Brach still in possession, Amoco filed a forcible detainer action in the Circuit Court of DuPage County, Illinois. In August, Brach filed this suit in the United States District Court for the Northern District of Illinois seeking an injunction against nonrenewal, exemplary damages, and attorney's fees. Specifically, Brach claimed that Amoco failed to give proper notice of nonrenewal and that nonrenewal was not justified under the PMPA. Amoco filed a counterclaim asking for an order to vacate the premises and damages. Both parties made oral cross-motions for summary judgment, the disposition of which is the subject of this appeal.

## II. OVERVIEW OF THE PETROLEUM MARKETING PRACTICES ACT

Congress enacted the PMPA in an effort to protect "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep.No.95–731, 95th Cong., 2d Sess. 15, reprinted in [1978] U.S. Code Cong. & Ad.News 873, 874 ("Senate Report"). The franchise relationship in the petroleum industry is unique in that the franchisor commonly not only grants a trademark license and supplies the products but also leases the service station premises

to the franchisee. As Congress noted, "[t]his relationship is, therefore, often complex and characterized by at times competing interests." Id. at 17, U.S.Code Cong. & Ad.News at 875. Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one. Id. at 17–19, U.S.Code Cong. & Ad.News at 875–77.

The PMPA prohibits termination of any franchise or nonrenewal of any franchise relationship [2] except on the basis of specifically enumerated grounds and upon compliance with certain notification requirements. 15 U.S.C. §§ 2802(a), (b)(1). Section 2802(b)(2) sets forth grounds for termination and nonrenewal: (A) failure to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship; (B) failure to exert good faith efforts to carry out the provisions of the franchise; (C) the occurrence of an event which is relevant to the franchise relationship and makes termination or nonrenewal reasonable; (D) a written agreement to end the franchise relationship; and (E) a good faith decision to withdraw from the relevant geographic market.[3] Section 2802(b)(3) enumerates additional grounds which provide a basis for nonrenewal only: (A) failure to agree to good faith changes to the franchise provisions; (B) receipt of numerous bona

---

**2.** The term "franchise" refers specifically to the trademark license and includes any contract under which the leased marketing premises are occupied or which pertains to the supply of motor fuel to be sold under the trademark. 15 U.S.C. § 2801(1). That term is to be distinguished from the term "franchise relationship" which means "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." Id. § 2801(2).

**3.** Invocation of these grounds is further conditioned on various time limitations which are designed to prevent franchisors from basing termination or nonrenewal upon "old and long forgotten events," yet which give the franchisor adequate time to evaluate the events or to work with the franchisee to correct the situation. See Senate Report at 33–34, U.S.Code Cong. & Ad.News at 892.

fide customer complaints; (C) continued failure to operate the premises in a clean and safe manner; and (D) if the franchise term was at least three years long, a good faith decision to convert the premises to another use or that renewal would be uneconomical despite any reasonable changes to the provisions of the franchise.

The notice requirements of the PMPA are embodied in section 2804. Generally, notice of termination or nonrenewal must be "furnished" not less than 90 days before the effective date. *Id.* § 2804(a)(2). The PMPA provides two exceptions: in circumstances in which compliance would not be reasonable, the franchisor need only furnish notice at the earliest date practicable, *id.* § 2804(b)(1), and in the case of termination or nonrenewal based on a market withdrawal decision, the franchisor must furnish notice not less than 180 days before the effective date, *id.* § 2804(b)(2). The notification must be written and posted by certified mail (or personally delivered) and must contain a statement of intent to terminate or not to renew, the reasons therefor, the effective date of termination or nonrenewal, and a PMPA summary statement prepared by the Secretary of Energy. *Id.* §§ 2804(c), (d).

### III. APPLICABILITY OF THE PMPA

The district court found that a month-to-month tenancy existed at the time the PMPA went into effect on June 19, 1978 and therefore held the Act applicable. Amoco argues on appeal that the PMPA does not apply because the tenancy expired (and thus its failure to renew occurred) no later than May 1, 1978, which was more than one month before the Act became effective. Amoco insists that it involuntarily continued delivery of motor fuel pursuant to Department of Energy regulations and should not be deemed to have extended the tenancy beyond the May date.

■ The question then is whether Amoco's "failure to renew" occurred on or after June 19, 1978.[4] The district court recognized, and we agree, that the PMPA may apply to the nonrenewal of a month-to-month tenancy. *Accord, Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1116 n.1 (D.Conn. 1980); *see also Halder v. Standard Oil Co.*, 642 F.2d 107 (5th Cir. 1981); *Kajdan v. Exxon Co., U.S.A.*, 1980–1 Trade Cases ¶ 63,262 (D.Conn.1980). With that Amoco has no argument. Rather, Amoco urges reversal of the district court's finding that a month-to-month tenancy existed on June 19, 1978.

■ Under Illinois law, "[a] holdover tenancy is created when a landlord elects to treat a tenant, after the expiration of his lease, as a tenant for another term." *Bismarck Hotel Co. v. Sutherland*, 92 Ill. App.3d 167, 171, 47 Ill.Dec. 512, 515, 415 N.E.2d 517, 520 (1st Dist. 1980). Whether the landlord elected to treat the tenant as a holdover rather than as a trespasser depends on the landlord's intent and thus raises a question of fact. *Id.; First Commercial Bank of Chicago v. Point of View, Inc.*, 9 Ill.App.3d 515, 292 N.E.2d 482 (1st Dist. 1972) (abstract of decision). In its letter dated November 7, 1977, Amoco expressly elected to extend the tenancy six months to May 1, 1978. *See, e.g., Leonard v. Anderson*, 331 Ill.App. 410, 73 N.E.2d 657 (1st Dist. 1947) (abstract of decision). That letter also indicated a willingness to grant further lease extensions: "We will, however, work with you in the event you are in the middle of construction on your new facility and the May 1, 1978 date approaches." Particularly significant is a let-

---

4. We believe Congress intended the Act to apply only to nonrenewals of leases that expire on or after June 19, 1978. *Accord, Ted's Tire Service, Inc. v. Chevron U.S.A. Inc.*, 470 F.Supp. 163, 165 (D.Conn.1979). Section 2801(14), for example, defines nonrenewal to encompass "a failure to reinstate, continue, or extend the franchise relationship ... (C) following a termination (*on or after June 19, 1978*) of the relevant franchise ...." (emphasis added). *See Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1303–04 (D.Minn.1979). Since its purpose is to ensure that the nonrenewal limitations apply to franchise terminations in the same way they apply to franchise expirations, Senate Report at 31, U.S.Code Cong. & Ad.News at 890, section 2801(14)(C) implicitly assumes that the PMPA applies only to nonrenewal of franchises that expire on or after June 19, 1978.

ter dated May 25, 1978 which stated that Amoco "do[es] not elect to continue the existing lease arrangement," but went on to state that Amoco "hereby cancel[s] said lease *effective June 30, 1978.*" (emphasis added). The May 25th letter, coupled with Amoco's acceptance of rent after the May 1 expiration date, could reasonably lead the district court to conclude that Amoco intended to extend the franchise at least an additional two months. *See Hoefler v. Erickson,* 331 Ill.App. 577, 584–85, 73 N.E.2d 448, 451 (1st Dist. 1947); *accord,* Restatement (Second) of Property § 14.4, Comments e, f (1977); *see also Munno,* 488 F.Supp. at 1116 n.1. The nonrenewal date then became June 30, 1978, eleven days after the PMPA went into effect. The May 25th letter was merely a *notice of intent* not to renew; nonrenewal would not actually occur until the extended expiration date, June 30th. *See Frisard v. Texaco Inc.,* 460 F.Supp. 1094, 1098 (E.D.La.1978). Only for the period after June 30th did Amoco state, in a letter dated June 29, 1978, that it would continue involuntary gasoline deliveries pursuant to Department of Energy regulations and that such would not constitute "a waiver of [its] demand for possession of the premises." Even in that letter Amoco reiterated that its demand was "effective June 30th." At least as to the period between May 1, 1978 and June 30, 1978, this case is unlike *Trigg v. Texaco, Inc.,* 511 F.Supp. 447 (S.D.Tex.1981), where Texaco clearly specified and adhered to a termination date before June 19, 1978, and continued deliveries thereafter only under the regulations. Even in a letter dated February 7, 1980, Amoco unequivocally stated that the "lease . . . is presently on a month-to-month basis." That statement also could be construed as a waiver of any previous notice to quit. *See Bismarck Hotel,* 92 Ill.App.3d at 173, 47 Ill.Dec. at 516, 415 N.E.2d at 521. It was not clearly erroneous under Illinois law for the district court to conclude that Amoco failed to renew a month-to-month tenancy existing after the PMPA effective date.

## IV. COMPLIANCE WITH THE PMPA

The district court ruled that section 2802(b)(3)(D), which permits nonrenewal for economic reasons, does not apply since that ground is available only where the expired lease had a term of three years or longer,[5] and that Brach's inability to secure financing does not constitute "[t]he occurrence of an event which is relevant to the franchise relationship and [for which] nonrenewal . . . is reasonable" under section 2802(b)(2)(C).[6] On appeal, Amoco contends that the default on the real estate contract, which was purportedly entered into in order to make the franchise economical, should be considered an "event" within the intendment of section 2802(b)(2)(C). Amoco also suggests that nonrenewal is justified because Brach "broke his promise" to leave the station by May 1, 1978. With respect to section 2802(b)(3)(D), Amoco attacks as un-

---

5. Section 2802(b)(3)(D) provides in pertinent part:

   In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—
   (i) such determination is—
       *   *   *   *   *   *
   (IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

6. Section 2802(b)(2)(C) provides:

   The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—
   (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or
   (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

constitutional the "retroactive" application of the three-year lease requirement to franchise relationships established before the enactment of the PMPA.[7]

The district court, however, found that Amoco complied with the PMPA notification requirements. Brach appeals from the entry of summary judgment on that issue, arguing that Amoco failed to specify the reasons for nonrenewal, 15 U.S.C. § 2804(c)(3)(A).

The Act provides that after the franchisee has proven that the franchisor failed to renew the relationship, the franchisor "shall bear the burden of going forward with evidence to establish as an affirmative defense" that the nonrenewal was permitted under sections 2802(b)(2) or (3) and that the notice requirements of section 2804 were met. 15 U.S.C. § 2805(c); *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982). We conclude that Amoco satisfied this burden as to the notice requirement and raised a genuine issue of fact as to the propriety of nonrenewal.

### A. Section 2802(b)(2)(C)

■ Section 2802(b)(2)(C) permits nonrenewal based on "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." In section 2802(c), Congress gives twelve illustrations of such events ranging from the loss of the franchisor's right to possession of the premises through expiration of an underlying lease to the conviction of the franchisee of any felony involving moral turpitude.[8] The legislative history of the PMPA says that "[t]he enumerated list is not exclusive. Other events satisfying the statutory standards set forth in [section 2802(b)(2)(C)] ... may nevertheless serve as a ground for termination or nonrenewal under" that section. Senate Report at 38, U.S.Code Cong. & Ad.News at 896. Congress thus shifted to the courts the task of interpreting the fairly open-ended language of subsection (b)(2)(C).

Congress did not, however, intend to give the courts carte blanche to define the parameters of section 2802(b)(2)(C). The enumerated list in section 2802(c) was intended to guide the courts by providing "a measure of Congressional intent with respect to the meaning of this statutory standard." *Id.* at 38, U.S.Code Cong. & Ad.News at 896. Congress further admonished that "events which are not enumerated in subsection (c) must be carefully scrutinized by the courts prior to a determination that the statutory standard set forth in section [2802](b)(2)(C) has been satisfied." *Id.* Courts must therefore closely analyze the alleged "event" in light of the list set forth in 2802(c), the other statutory provisions, and the underlying policies, lest they disturb Congress' purposeful plan.[9] Decisions must necessarily be made on a case-by-case basis.

**7.** Amoco raises for the first time on appeal (and even then only in its reply brief) that nonrenewal was properly based on section 2802(b)(3)(A)(i) because Brach failed to "agree to changes ... to the provisions of the franchise" by defaulting on the real estate contract. Although we need not address that asserted ground, we note that Brach did agree to the change, but only that he did not fulfill his end of the bargain. Amoco's argument also fails because the real estate contract was not a change to the provisions of the *franchise* as such. *See* note 10 *infra*.

**8.** Other examples include fraud or criminal misconduct relevant to the operation of the premises, bankruptcy, disability for an extended period of time, condemnation of all or part of the premises, franchisor's loss of the trademark rights, destruction of the premises, failure to pay in a timely manner all sums to which the franchisor is entitled, wilful trademark violations, and knowing failure to comply with relevant laws.

**9.** *But compare Lanham v. Amoco Oil Co.*, 481 F.Supp. 405, 407 (D.Md.1979) ("It is merely logical to determine that death of the franchisee" constitutes a "relevant event") *with Petroleum Marketing Practices: Hearings on H.R. 130 Before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce*, 95th Cong., 1st Sess. 334 (1977) (remarks of Rep. Dingell, Chairman) (offering two illustrations "which may well indicate that perhaps [adding 'death' to the list] may not be the best way for us to go") ("Hearings").

■ "As in all cases of statutory construction, our task is to interpret the words of [section 2802(b)(2)(C)] in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); *see Veracka v. Shell Oil Co.*, 655 F.2d 445, 448 (1st Cir. 1981) (15 U.S.C. § 2802(c)(4)). "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law, and to its object and policy." *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849); *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

The statutory scheme of the PMPA seeks to strike a balance between the interests of the participants in a petroleum marketing franchise relationship. Congress recognized the disparity of bargaining power between franchisor and franchisee and the harsh consequences of suddenly terminating a business for which the franchisee has worked long and hard to develop goodwill. *See* 123 Cong.Rec. 10386 (1977) (remarks of Rep. Mikva). Echoing those concerns, the PMPA commits gasoline franchisors to a franchise marriage of sorts, the dissolution of which is available only on specific grounds. While most of the grounds relate to serious franchisee misconduct, others reflect an intent to permit the franchisor to exercise reasonable business judgment. The franchisor, for example, may act upon a determination made in good faith and in the normal course of business to withdraw from the geographic market, 15 U.S.C. § 2802(b)(2)(E), that renewal is likely to be uneconomical, *id.* § 2802(b)(3)(D)(i)(IV), or to convert the premises to another use, *id.* § 2802(b)(3)(D)(i)(I). Although one prerequisite to invoking any of those grounds is the existence of a three-year lease, compromises were nonetheless made which would allow a franchisor to "buy out" a franchisee under a short-term lease based on any of the enumerated business decisions, *id.* § 2805(c) (injunctive relief prohibited), or to make the marriage more comfortable by imposing good faith changes to the franchise, *id.* § 2802(b)(3)(A). But the one

thing the Act is clearly intended to prevent is the appropriation of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern. *See* 123 Cong.Rec. 10385 (remarks of Rep. Conte); *id.* at 10386 (remarks of Rep. Mikva).

As the statutory scheme shows, "the grounds specified as justification for termination or nonrenewal of a franchise are intentionally broad enough to provide to franchisors the flexibility which may be needed to respond to changing market conditions or consumer preferences," *id.* at 10383 (remarks of Rep. Dingell), yet are not "so broad as to deny franchisees meaningful protections from arbitrary or discriminatory terminations and nonrenewals or to prevent fulfillment of the reasonable renewal expectations of franchisees," Senate Report at 18, U.S.Code Cong. & Ad.News at 877. With this congressional design in mind, we turn to the provision at issue.

■ Section 2802(b)(2)(C) plays a vital role in maintaining that delicate balance. It typifies Congress' desire to retain some flexibility in franchise relationships by providing for unforeseen yet reasonable grounds. But the broad language of that section gives the courts cause for concern. As one commentator noted, section 2802(b)(2)(C) is a "catchall provision [that] will undoubtedly give rise to litigation for years to come." O'Brien, *Federal Laws Affecting the Right of a Franchisor to Terminate or Not Renew a Franchise: Petroleum Marketing Practices Act*, 49 Antitrust L.J. 1371, 1374 (1981). A broad, open-ended construction of that provision could tip the scale decidedly in favor of economically powerful franchisors. Such would offend the manifest policies underlying the Act and abrogate the limitations placed on termination and nonrenewal under other sections. Our duty is to give the PMPA "the most harmonious, comprehensive meaning possible." *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); *Clark v. Uebersee Finanz-Korp.*, 332 U.S.

480, 488, 68 S.Ct. 174, 177, 92 L.Ed. 88 (1947). As remedial legislation, the Act must be given a liberal construction consistent with its overriding purpose to protect franchisees. *See United States v. Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969); *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1305 (D.Minn.1979).

To determine whether Brach's default constitutes a relevant event which makes nonrenewal reasonable, we look to how the Act treats similar situations. As one commentator observed, section 2802 "is extremely complex and its sections must continually be read with reference to all other portions of this section." Farrell, *Franchising in Connecticut—"Can Anybody Here Play This Game?,"* 54 Conn. B.J. 446, 464 (1980). Section 2802(b)(2)(A), although not directly applicable,[10] is most closely analogous. That section permits nonrenewal where the franchisee fails to comply "with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship."[11] A related section gives as a basis for nonrenewal "[a] failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise."[12] *Id.* § 2802(b)(2)(B). To a lesser extent, Brach's conduct is similar to one of the enumerated events: "failure ... to pay the franchisor in a timely manner when due all sums to which the franchisor is legally entitled." *Id.* § 2802(c)(8). That provision, however, is more intended to cover the potential problem of repeated lateness or arrearage in rent or motor fuel payments rather than the situation here. *See, e.g., Kajdan, supra; see* Senate Report at 38, U.S.Code Cong. & Ad.News at 896. But nonrenewal for untimely payments is said to be subject to the "prevailing commercial or industrial trade practices." Senate Report at 38, U.S.Code Cong. & Ad.News at 896, which further suggests that events in the nature of contract violations must be assessed by an independent analysis of reasonableness and materiality. In a definitional section, the Act also limits the availability of these grounds by providing that " 'failure' does not include ... any failure for a cause beyond the reasonable control of the franchisee."[13] 15 U.S.C. § 2801(13)(B).

A construction should not be adopted that would allow franchisors to circumvent the limitations embodied in other related sections simply because the franchisee failed to comply with, carry out, or agree to provisions which were not contained in the franchise itself but were nonetheless relevant to the franchise relationship. As we believe the provisions just discussed show, whether

---

**10.** Sections 2802(b)(2)(A) and (B) apply only to violations of the terms of the franchise itself. "Franchise" refers to the motor fuel trademark license and specifically includes "secondary arrangements" such as the service station lease and motor fuel supply agreement. 15 U.S.C. § 2801(1). The reason for including leases and supply contracts within that definition was to prevent franchisors from circumventing the substantive provisions of the Act by cancelling other arrangements which would render the trademark license valueless. Senate Report at 29, U.S.Code Cong. & Ad.News at 888. Neither the definition of "franchise" nor its rationale brings the Amoco-Brach real estate contract within the reach of sections 2802(b)(2)(A) or (B). Our view might be different if the agreement were a land contract entered into *in lieu of* a lease.

**11.** To invoke subsection (b)(2)(A), the franchisor must also have "first acquired actual or constructive knowledge of such failure—
(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title."

**12.** The text of that section continues as follows:
... if—
(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and
(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

**13.** In an earlier draft of H.R. 130 this section defined the more specific term "failure to comply." *See* Hearings, *supra* note 8, at 7. Apparently, Congress adopted the change so that those definitional limitations would apply to any ground based on a "failure" by the franchisee.

nonrenewal is "reasonable" in this case under section 2802(b)(2)(C) at a minimum would seem to depend on 1) whether the real estate contract was material to the franchise relationship, 2) whether the relevant provisions of the real estate contract were reasonable, and 3) whether the default was beyond the reasonable control of the franchisee.

Materiality, as one court explained in construing another statute, "is applied as an objective test of the significance of a fact to the transactions under consideration." *Castaneda-Gonzalez v. I. N. S.*, 564 F.2d 417, 431 (D.C.Cir.1977). The materiality requirement which we adopt from section 2802(b)(2)(A) reflects the congressional concern that termination or nonrenewal might be based on "technical or minor violations of the contract." *See* Senate Report at 18, U.S.Code Cong. & Ad.News at 876. Congress expressly noted, however, that "[s]ome contractual violations, although not readily reducible to a dollar value, may be so serious as to undermine the entire relationship." *Id.* Even though Brach defaulted on the real estate contract, the "franchise" as such, which existed independent of that contract, remained intact and unaffected.[14] But Amoco insists, and offered affidavits to show, that continuation of the franchise relationship under the present lease arrangement would be uneconomical for Amoco. The district court did not address this potential effect of the default when it stated, "Nor does this failure to secure financing constitute any other judicially determined event which would permit nonrenewal under section 2802."

From a reading of the Act it is apparent that Congress recognized such economic considerations to be material to the franchise relationship.[15] *Cf.* 15 U.S.C. §§ 2802-(b)(3)(D)(i)(IV), 2805(c)(1)(A)(v). Moreover,

when Congress used the term "uneconomical" in other sections of the Act, it did not mean that the relationship must be "unprofitable," but intended to "permit consideration of profitability in a broad economic sense." Senate Report at 36–37, U.S.Code Cong. & Ad.News at 895. On this score, Brach responds that the lease arrangement was not uneconomical and that Amoco's profitability study constituted a misrepresentation designed to mask an otherwise arbitrary attempt to end the franchise relationship. As a hint of ulterior motive, Brach suggests that Amoco was forced to accept Brach's franchise from Exxon as part of a package deal even though it did not fit into Amoco's business plan.

■ While it is essential that the district court here examine the economic foundation for the real estate contract in order to determine that materiality of the default, that inquiry is a narrow one. Congress cautioned that courts, in evaluating such economic business decisions, should not apply the so-called "reasonable business judgments" test, but must follow the Act's twofold test. *See generally* Finch, *Judicial Interpretation of the Petroleum Marketing Practices Act: Strict Construction of Remedial Legislation*, 37 Bus.Law. 141, 147–55 (1981). First, the franchisor determination must have been made in "good faith," a subjective standard. See *Munno*, 488 F.Supp. at 1118–21, for a thorough discussion of the good faith standard. Second, the determination must have been made "in the normal course of business." *See* 15 U.S.C. §§ 2802(b)(3)(D), 2805(e)(1)(A); *cf. Id.* § 2802(b)(3)(A). "These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or nonrenewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine

---

**14.** Merger occurs, if at all, only upon closing.

**15.** Because the pre-existing franchise between Brach and Amoco was of a duration less than three years, Amoco cannot refuse renewal solely on the basis that continuation of the relationship would be uneconomical. 15 U.S.C. § 2802(b)(3)(D)(i)(IV). Rather, we arrive at our analysis of economic reasons, and consequent reliance on that section by analogy, due to the

way in which the Act permits franchisors to impose franchise changes in good faith in order to make the relationship a workable business arrangement. The reasons for any such changes, here alleged to be economic, surface and become relevant to the question of materiality when the franchisor attempts to base nonrenewal on the franchisee's failure to comply with or carry out those agreed changes.

whether a particular marketing strategy ... is a wise business decision." Senate Report at 37, U.S.Code Cong. & Ad.News at 896. Here, for example, the court should not engage in a detailed critique of Amoco's profitability study or the line Amoco draws to separate the profitable from the unprofitable, although some analysis may be necessary to determine whether the rating given Brach's franchise was nothing more than a pretext for nonrenewal.

Congress also stated that "any evaluation of the economics of nonrenewal must be made in view of changes in the terms or conditions of the franchise agreement which may be acceptable to the franchisee." Senate Report at 37, U.S.Code Cong. & Ad.News at 895. Accordingly, section 2802(b)(3)(D) permits, under certain circumstances, nonrenewal based on a determination that renewal would likely be uneconomical *"despite* any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee." (emphasis added). Brach interprets this to mean that Amoco should be bound to renegotiate the franchise rather than opt for nonrenewal without further effort to make the relationship economical. We do not agree with that construction.

The cited provision does not impose an obligation to exhaust *every* means to cure the problem. Given its express concern that franchisors be accorded sufficient flexibility to respond to market conditions, Congress certainly did not contemplate the perpetuation of an economically burdensome franchise relationship. It is sufficient that the franchisor has made a reasonable effort to "make it work." This construction finds compelling support in section 2802(b)(3)(A), which permits nonrenewal if the franchisee fails to agree to good faith changes to the provisions of the franchise. As its legislative history reveals, that subsection was intended to compensate franchisors for the prospective loss of decision-making freedom occasioned by the application of the Act. Senate Report at 32, U.S.Code Cong. & Ad.News at 890. Nowhere does Congress hint that nonrenewal based on a refusal to accede to new terms is prohibited where "more acceptable" alternatives are available. Adoption of Brach's interpretation would in effect allow the tail to wag the dog.

Even if the default is found to be material to the relationship, the court should determine the reasonableness of the contract itself. This, of course, is a similarly limited inquiry, and deference must be given the legitimate business decisions of franchisors. *See Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477 (M.D.Pa.1981); *Malone v. Crown Central Petroleum Corp.,* 474 F.Supp. 306 (D.Md.1979). It is sufficient that the policy or contract has a basis in common sense and experience and is not unconscionable. *Waldman,* 515 F.Supp. at 483. Without deciding the merits, we note that section 2802(b)(3)(A) provides a vehicle by which franchisors can endeavor to make an uneconomical relationship more fruitful through contractual modifications. *See, e.g., Pearman v. Texaco Inc.,* 480 F.Supp. 767, 771 (W.D.Mo.1979) (market conditions justified rent increases); *Ferriola v. Gulf Oil Corp.,* 496 F.Supp. 158, 163 (E.D.Pa. 1980), *aff'd without op.,* 649 F.2d 859 (3d Cir. 1981) (the Act allows "hard-line business decisions designed to minimize [the franchisor's] cost of doing business"). That sale of the premises to the franchisee may be a reasonable response to an uneconomical situation is suggested by section 2802(b)(3) (D), which allows nonrenewal of three-year leases where to do so would be uneconomical, provided the franchisor made a bona fide offer to sell the premises to the franchisee.

From our review of the record, it is also questionable whether Brach made all reasonable efforts to obtain the requisite financing to close the transaction. A letter Brach's attorney mailed to Amoco said:

As you know, Mr. Brach had made several applications for loan commitments which he felt would be secured by guarantees by the Small Business Administration. Mr. Brach now advises my office that due to the increase in the prime interest rate since the execution of the contract, and threatened supplies of oil products, the banks have now declined to participate.

The cause of Brach's inability to secure a loan remains unclear. Perhaps it resulted

from unqualified rejections by lending institutions, but on the other hand, his own insistence on lower interest rates may have been the problem. As with all other elements of grounds for nonrenewal, the defendant has the burden to show that the failure was "beyond the reasonable control of the franchisee."[16] *Marini v. Atlantic Richfield Co.*, 475 F.Supp. 142, 143–44 (D.N. J.1979).

We do not, however, adopt Amoco's argument that when a franchise relationship becomes uneconomical an "event" has thereby occurred which is relevant to the franchise and for which nonrenewal is reasonable. Such a construction would in part undermine the elaborate statutory scheme of the PMPA and in effect would repeal section 2802(b)(3)(D)(i)(IV), which limits that ground to nonrenewal of franchises with three-year terms. We cannot adopt a construction of section 2802(b)(2)(C) that would render superfluous Congress' express limitation on nonrenewal in other parts of the Act. *See Weinberger*, 412 U.S. at 633, 93 S.Ct. at 2485.

We also find no merit in the contention that Brach violated an "agreement" to vacate the premises. Section 2802(b)(2)(D), under certain conditions, gives effect to written agreements between franchisors and franchisees not to renew the relationship. Nothing in the record shows that the parties entered into the type of formal agreement contemplated by that section.

## B. Constitutionality

Amoco urges this court to construe the three-year limitation in section 2802(b)(3)(D) as applicable only to franchise relationships commenced after the Act's effective date and thus allow nonrenewal in this case on economic grounds. Amoco contends, without elaboration or citation of authority, that retroactive application of the three-year requirement "casts serious constitutional doubt" on the Act.

Federal statutes are to be construed, whenever the language or history permits, as to avoid serious doubt of their constitutionality. *International Association of Machinists v. Street*, 367 U.S. 740, 749, 81 S.Ct. 1784, 1789, 6 L.Ed.2d 1141 (1961). But the nonrenewal provisions of the PMPA clearly apply to franchises entered into before the Act's effective date. 15 U.S.C. § 2802(a)(2). In particular, section 2802(b)(3)(D), of which Amoco complains, expressly applies "[i]n the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such a date, is 3 years or longer)." We therefore cannot accept Amoco's proposed interpretation, *Chicago Transit Authority v. Adams*, 607 F.2d 1284, 1289–90 (7th Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), and must proceed to analyze this application under the fifth amendment due process clause. *Cf. Frisard*, 460 F.Supp. at 1101.

In a very narrow sense, the Act's nonrenewal provisions apply retroactively in that they arguably upset the renewal expectations (whether reasonable or unreasonable) under which franchisors originally entered into franchise relationships before publication of the PMPA. It is well settled law, however, that Congress can enact retrospective remedial legislation. "Federal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it. Immunity from federal regulation is not gained through forehanded contracts." *F. H. A. v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958), *quoting Fleming v. Rho-*

---

16. One district court opined that a reasonable provision is *ipso facto* a provision with which compliance is not beyond the reasonable control of the franchisee. *Waldman*, 515 F.Supp. at 483 n.5. We note, however, that a provision may be intrinsically reasonable, but unforeseen circumstances may impede compliance. In such a case, the original business decision of the franchisor is no less reasonable. As in commercial law, a contract conscionable when made is conscionable always. *See* U.C.C. § 2–302, comment 1. The "beyond the reasonable control" limitation is merely a legislated excuse for nonperformance.

*des,* 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947). As Justice Marshall noted in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), retroactive legislation is not unconstitutional simply "because it upsets otherwise settled expectations." The *Turner Elkhorn* decision suggests that the retrospective aspects of a statute will survive judicial scrutiny if they are rationally related to a legitimate legislative purpose, even though they may impair recognizable property rights. *See* J. Nowak, R. Rotunda & J. Young, Constitutional Law 433 (1978).

By enacting the PMPA, Congress has shown special solicitude for the security of petroleum marketing franchisees. The three-year lease restriction on the business judgment grounds for nonrenewal was adopted to guarantee franchisees a minimum duration within which to develop a successful business so long as they act in good faith. *See* Hearings, *supra* note 8, at 169–70 (statement of Mr. Cohen), 250–51, 279–80 (statements of Mr. Demarest). That limitation also recognizes that the discretionary nature of such grounds can have a strong "leverage effect" over franchisees who do not have the protection of long-term contracts. *See id.* at 128 (statement of Mr. Binsted), 259–60 (statement of Mr. Johnson). The three-year limitation specifically represents a rational compromise between the need for franchisee security and the perceived property rights of franchisors. *See id.* at 333 (statements of Mr. Griffin and Mr. Demarest). If the Act were applied only to franchise relationships commenced after the effective date, a vast majority of franchisees would likely be denied this protection.

The PMPA also contains various compensating provisions which allow franchisors flexibility in business decision-making. Specifically, the Act does not lock franchisors into existing uneconomical relationships as such. Under section 2805(c), for example, franchisors can "buy out" uneconomical franchises regardless of their duration. Other provisions allow franchisors to make their arrangements more economical by making changes to existing franchise provisions, 15 U.S.C. § 2802(b)(3)(A), or renewing the relationship under different terms, *see* Senate Report at 32, U.S.Code Cong. & Ad.News at 890. The franchise may also be terminated by written agreement. 15 U.S.C. § 2802(b)(2)(D). Moreover, the Act does not affect contractual grounds for termination of franchises entered into before enactment of the PMPA. 15 U.S.C. § 2802(a); *see* Senate Report at 31–32, U.S.Code Cong. & Ad.News at 890. Courts also have ruled that strict compliance with the specific notice provisions of section 2802 is not required where the franchise was entered into before the effective date. *See, e.g., Gaspar v. Chevron Oil Co.,* 490 F.Supp. 971, 974–75 (D.N.J.1980). One member of Congress explained, "this legislation troubles me [in that] the grounds for nonrenewal provisions of the bill are made applicable to existing franchises. However, . . . this legislation is a compromise, and it is one to which all parties involved have agreed." 123 Cong.Rec. 10384 (remarks of Rep. Brown). We do not sit in judgment on the wisdom of Congress' chosen scheme. *Turner Elkhorn,* 428 U.S. at 18–19, 96 S.Ct. at 2893. It is enough that the Act rationally furthers legitimate congressional concerns and does not unreasonably burden existing property rights.

*C. Notice*

Section 2804(c)(3)(A) requires that a notice of nonrenewal include, *inter alia,* a statement of the reasons therefor. By certified letter, Amoco notified Brach of its intent to close his account "inasmuch as you are unable to purchase the premises as previously stipulated." Brach argues that because the district court ruled impermissible Amoco's asserted ground for nonrenewal, the notice failed to give a reason for nonrenewal. Although we have concluded that the default *may* constitute a ground for nonrenewal, in the event it is not so found at trial the notice issue could arise once again with respect to the court's power to grant injunctive relief.[17] *See* 15 U.S.C. § 2805(e)(1)(B).

---

**17.** Our ruling in favor of Amoco on the substantive issues obviates the need to address

Brach's cross-appeal concerning the district court's denial of injunctive relief.

■ Brach's argument confuses the reasons for nonrenewal with the grounds for nonrenewal. The PMPA requires only that the franchisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act. *See Davy v. Murphy Oil Corp.*, 488 F.Supp. 1013, 1015 (W.D.Mich.1980). Amoco's notice adequately apprised Brach in that regard and complies with section 2804(c) in all other respects.

## V. COMPULSORY COUNTERCLAIM

■ Amoco filed a counterclaim seeking an order to vacate the service station premises and asking for damages for Brach's refusal to surrender the premises. The district court found that the counterclaim was permissive and dismissed it for want of subject matter jurisdiction. The court based that finding on the fact that the counterclaim was the subject of an action then pending in the Circuit Court of Du-Page County, Illinois. Amoco argues, and we agree, that the counterclaim was compulsory and therefore within the court's ancillary jurisdiction.

Federal Rule of Civil Procedure 13(a) sets forth the rule on compulsory counterclaims:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim .... But the pleader *need not* state the claim if (1) at the time the action was commenced the claim was the subject of another pending action ....

(emphasis added). It is widely recognized that the "pending action" exception is intended to enable a party to escape the waiver rule normally applicable to compulsory counterclaims that a party fails to plead, but that a party *may elect* to treat the counterclaim as compulsory (if it arises out of the same transaction or occurrence) and thus within the court's ancillary jurisdiction even though it is the subject of a pending action. *See, e.g., H. L. Peterson Co. v.*

*Applewhite*, 383 F.2d 430, 433 n.3 (5th Cir. 1967); *Union Paving Co. v. Downer Corp.*, 276 F.2d 468, 470–71 (9th Cir. 1960); *Fox Chemical Co. v. Amsoil, Inc.*, 445 F.Supp. 1355, 1361 (D.Minn.1978). The commentators also agree on this construction of rule 13(a). *See* 3 Moore's Federal Practice ¶ 13.14[2], at 13–332 to –333 (1980); 6 C. Wright & A. Miller, Federal Practice & Procedure § 1411, at 59–60 (1971); Fed. Proc., L.Ed. § 62:218 (1981). Amoco's counterclaim clearly arises out of the same transaction as Brach's suit under the PMPA. The district court therefore has subject matter jurisdiction over the counterclaim.

## VI. CONCLUSION

For the foregoing reasons, the decision of the district court is affirmed in part and reversed in part. The cause is hereby remanded for further proceedings not inconsistent with this opinion.