Thomas J. CIANFROCCO and Vincent
E. Cianfrocco, Plaintiffs,

v.

GULF OIL CORPORATION, Defendant.

Civ. A. No. 84–0074–C(K).

United States District Court,
N.D. West Virginia,
Clarksburg Division.

Sept. 11, 1984.

Michael Tomasky, Tomasky & Friend, Morgantown, W.Va., for plaintiffs.

Herbert G. Underwood, William E. Galeota, Steptoe & Johnson, Clarksburg, W.Va., and Robert A. Nailling, Mark A. Brand, Houston, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

KIDD, District Judge.

### Finding of Facts

On April 5, 1984, the plaintiffs, Thomas J. Cianfrocco and Vincent Cianfrocco, filed their complaint alleging violations of the Sherman Act, Clayton Act, Robinson-Patman Act, the Petroleum Marketing Practices Act, and the Uniform Commercial Code. Gulf Oil Corporation, the defendant herein, filed its answer in this matter on May 15, 1984. On July 23, 1984, the Court held a hearing on whether a preliminary injunction should issue in this matter.

1. On December 14, 1972, Gulf Oil Corporation and the plaintiffs entered into their initial contract. Pursuant to the 1972 Agreement the plaintiffs were a wholesale consignee of the various products of the defendant and acted as a distributor of such products. As such, any customer accounts serviced by the plaintiffs were the defendant's accounts and title to the products passed from Gulf to the customer upon delivery by the plaintiffs to that particular customer. The plaintiffs were under a commission basis based upon the gallon amount of gasoline they sold. The February 1972 agreement terminated on February 12, 1980.

2. On February 12, 1980, the parties entered into a contract which changed the Cianfroccos' status from consignee to jobber with respect to all Gulf products they purchased except gasoline—i.e., lubricating oil, greases, distillates, and kerosene. As part of this changeover, Gulf assigned the Cianfroccos certain of its accounts for these products. On September 10, 1980, a similar contract and assignment were entered into with respect to gasoline. The Cianfroccos have been a jobber for all Gulf products they have purchased since that date. This jobber arrangement differs significantly from their former consignment arrangement: the Cianfroccos now purchase products from Gulf, and legal title to the products passes to the Cianfroccos.

They then sell the products to their customer accounts in whatever manner and at whatever prices they choose. (As consignee, the Cianfroccos never acquired title to the products.)

3. Effective June 1, 1982, the parties entered into new contracts, which are currently in effect. With certain differences not relevant here, these contract documents are the same as the ones immediately preceding them, which were signed in 1980. The "Brand Jobber Contract of Sale" and certain "Commodity Schedules" are the major documents governing the jobber relationship. Significantly, the Brand Jobber Contract of Sale contains the following integration clause:

> This agreement contains each and every agreement and understanding existing between the parties relating to the subject matter of this contract, and no amendments or alterations thereto shall have any authorized manager of seller and by purchaser.

The Commodity Schedule dated June 1, 1982, sets forth the maximum monthly quantities of kerosene and distillates that can be purchased by the Cianfroccos between June 1, 1982, and May 31, 1983. The "Brand Jobber Commodity Schedule—Gasoline Special Provisions" dated June 1, 1982, sets forth the maximum and minimum gallonage of the various grades of Gulf gasoline to be sold to the Cianfroccos during that one year period. (These documents are attached to the Declaration of James H. White ("White Declaration") as Exhibits A and B, respectively; together, they will be referred to as the "Contract.")

4. The duration of the Contract is from year to year, subject to the effective dates provided for therein. The Contract automatically renewed itself on June 1, 1983, and was due to expire on May 31, 1984. As will be explained below, Gulf has extended that expiration date to July 31, 1984.

5. Under the Contract, the Cianfroccos pick up petroleum products from Gulf at Gulf's Neville Island Terminal near Pittsburgh, Pennsylvania. The Cianfroccos in turn resell Gulf products to their customers.

6. Under the Contract, the prices to be paid by all jobbers, including the Cianfroccos, for Gulf petroleum products are the applicable prices appearing on Gulf's Schedule of Prices on the date of delivery. The scheduled prices at which Gulf sells products at its Neville Island terminal are set by Gulf in response to changing market conditions.

7. As independent businessmen, the Cianfroccos are free to resell Gulf products in any area they may choose, since no jobber has an exclusive territory. The Cianfroccos have never been limited by Gulf to a particular or exclusive territory and have never been promised one.

8. The Contract sets forth the terms of payment by the Cianfroccos for Gulf products. These terms allow for extension of credit as arranged between Gulf and the Cianfroccos. Extension of credit to a jobber depends on the financial condition of the jobber. For the past year and a half, the Cianfroccos have refused to provide financial information to Gulf which would enable Gulf to determine whether and what amount of credit to extend to them.

9. Although not obligated to do so under its Contract with the Cianfroccos or any other jobber, Gulf paid to all jobbers, including the Cianfroccos, a handling or "hauling" allowance prior to December 15, 1982. This hauling allowance varied in amount among jobbers depending on how far they had to haul products from the terminal and was made in lieu of Gulf's having to pay a common carrier or incurring its own cost of delivering products to the jobber's place of business.

10. On December 15, 1982, Gulf changed from "delivered" pricing to "terminal" pricing on its gasolines, to all jobbers, including the Cianfroccos. Accordingly, Gulf discontinued the hauling allowances of all of its jobbers. This was done uniformly, without discrimination, to all jobbers. No jobber has been singled out for special treatment or given special allowances.

11. In addition to selling gasoline and distillates to jobbers on a whole-sale basis at "terminal" pricing, Gulf also sells these products directly to certain retail outlets in West Virginia, Western Pennsylvania, and parts of Ohio, from its Neville Island terminal at "delivered" pricing. This "delivered" price is referred to as "DTW" (dealer tank-wagon) price. There is disputed evidence as to whether a "DTW" price for a given area has ever been set by Gulf at a lower level than the terminal price then in effect for all jobbers serving that same area including the Cianfroccos. Gulf's retail-jobber sales manager for the Pittsburgh marketing district testified that, to his knowledge, there had never been such an occasion. Thomas J. Cianfrocco testified to the contrary, based upon his observation of retail pump prices in the Morgantown area and jobber "terminal" prices posted at the Neville Island terminal. In any event, because a "DTW" price includes the cost of transportation to a particular area and a jobber's terminal price does not, the two prices are not subject to strict comparison at any particular point in time.

12. By letters dated November 10, 1982, and December 14, 1982, the Cianfroccos were given notice that their hauling allowance was being discontinued. Those letters are attached to the White Declaration as Exhibits C and D, respectively. All other Gulf jobbers were also given notice of this change.

13. Unrelated to their jobber relationship with Gulf, the Cianfroccos continue to deliver products for Gulf to some of Gulf's own industrial and commercial accounts in West Virginia, for which deliveries the Cianfroccos are paid an agreed commission. These accounts have nothing to do with their jobber relationship with Gulf, their own accounts, or the discontinuance of the jobber hauling allowance.

14. As independent businessmen, the Cianfroccos sell Gulf products to their customers at a price set by the Cianfroccos in response to changing market conditions. Unlike the situation under their former consignment relationship, when they were paid an agreed-upon commission for servicing Gulf's accounts, the Cianfroccos receive no guaranteed commission or "profit margin" under their jobber relationship. The profit they can earn in the marketplace, as independent businessmen, may be more or less than the commission they previously were paid as consignee distributors.

15. By letter dated March 1, 1984, a copy of which is attached to the White Declaration as Exhibit F, Gulf sent new contract papers to the Cianfroccos for their signature. These new contract papers were to become effective on June 1, 1984, following the expiration of the Cianfroccos' current contracts on May 31, 1984. As other jobbers' contracts have neared expiration, new contract papers similar to the Cianfroccos' have also been sent to those jobbers. This is the regular and customary practice of Gulf in dealing with all of its jobbers. (There are eight (8) full-time jobbers in West Virginia. The seven (7) other than the Cianfroccos have already agreed to sign the new contract papers.)

16. The Cianfroccos, however, by their attorney Mr. Michael Tomasky, informed Gulf that they would not sign the new contracts.

17. In order to allow the Cianfroccos time to reconsider their position and to sign the new contracts, Gulf sent them a letter dated April 5, 1984, extending the expiration period of their current contracts from May 31, 1984, to July 31, 1984. Gulf has consistently told the Cianfroccos that they are welcome to sign the new contracts and renew their jobber relationship with Gulf.

18. On April 10, 1984, Gulf was served with the Cianfroccos' original Complaint in this lawsuit.

19. Both before and since the filing of the complaint, Gulf continued to assure the Cianfroccos that they could extend their jobber relationship with Gulf merely by signing the new contracts. The Cianfroccos have refused to sign the contracts, however, without specifying what, if any, particular terms or provisions thereof are unacceptable.

20. Therefore, by letter to the Cianfroccos dated May 1, 1984, attached to the White Declaration as Exhibit G, Gulf gave notice that the Cianfroccos' jobber relationship would not be renewed following its expiration on July 31, 1984. Gulf's letter stated that the jobber relationship was not being renewed "because of [the Cianfroccos] failure to agree to changes and additions to the franchise which were offered in good faith and in the normal course of business."

21. That letter was received by the Cianfroccos on May 2, 1984, as is shown by a copy of the green return receipt card attached to the White Declaration as Exhibit H. The Cianfroccos therefore were given ninety (90) days written notice, were advised of the grounds and effective date of the non-renewal, and were furnished with a summary of the provisions of the Petroleum Marketing Practices Act ("PMPA"), all as required by the PMPA.

*Conclusions of Law*

1. Plaintiffs are a "franchisee" and Cianfroccos a "franchisor" under the terms of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA").

2. The PMPA provides specific grounds for the non-renewal of the franchisor-franchisee relationship, one of which is the failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if:

(i) Such changes or additions are the result of determinations made in good faith and in the normal course of business; and

(ii) Such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchisee relationship.

15 U.S.C. § 2802(b)(3)(A).

3. The PMPA also requires Gulf to give proper notice of non-renewal of plaintiffs' franchise relationship with Gulf, 15 U.S.C. § 2804(a). Proper notification:

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain:

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;

(B) the date on which such termination or non-renewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.

15 U.S.C. § 2804(c).

4. The terms of the franchise relationship between plaintiffs and Gulf currently in effect is set forth in the "Brand Jobber Contract of Sale" dated June 15, 1982, effective June 1, 1982.

5. Gulf gave proper notice to plaintiffs that their franchise relationship would not be renewed effective after July 31, 1984.

6. To obtain a preliminary injunction under the PMPA, plaintiffs must show that there are "sufficiently serious questions going to the merits of the case to make them a fair ground for litigation" of the question of whether the franchisor's (Gulf's) non-renewal of the franchise relationship was proper. 15 U.S.C. § 2805(b)(2)(A)(ii), *Saad v. Shell Oil Co.,* 460 F.Supp. 114, 116 (E.D.Mich.1978).

7. The test of whether there is a "sufficiently serious question" is whether the franchisee (plaintiffs) was made a "significant showing of something that would constitute some reasonable chance of success" of showing that the non-renewal was improper. *Saad* at 116.

8. Under the PMPA, Gulf has properly non-renewed plaintiffs' franchise relationship in that:

(1) Gulf had proper grounds, *i.e.*

(a) Plaintiffs and Gulf failed to agree to changes to the provisions of the franchise (*i.e.*, a new contract),

(b) The changes were made by Gulf in good faith and in the normal course of business; and

(c) Gulf did not insist on the new contract for the purpose of preventing the renewal of its franchise/jobber relationship with plaintiffs; and

(2) Gulf gave proper notice to plaintiffs of the non-renewal.

9. Plaintiffs have not shown that Gulf's non-renewal of their franchise relationship was improper.

10. Apart from the question of proper non-renewal under the PMPA, plaintiffs have not shown the "likelihood of success on the merits" of their allegations in their original complaint, required as part of the traditional standard for injunctive relief as set forth in *Blackwelder Furniture Co., etc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 193 (4th Cir.1977).

11. Plaintiffs have not shown that they are entitled under their franchise relationship to a particular profit or specific margins between the price at which they purchase products from Gulf and the price Gulf sells to its dealers.

12. Plaintiffs have not shown that they are entitled under their franchise relationship to a special allowance for hauling products from Gulf's Neville Island (Pa.) terminal.

13. Maintenance of the status quo—that is, the jobber relationship currently existing between the Cianfroccos and Gulf—is available to the Cianfroccos as a contractual right. By execution of the new contract papers previously submitted to them, the jobber relationship would be continued by the Cianfroccos in all material respects, making injunctive relief to the same effect unnecessary.

14. Plaintiffs have not shown that they are entitled to injunctive relief, either under the PMPA, or under general equitable principles.

Therefore, plaintiffs' motion for a preliminary injunction is hereby DENIED for the reasons stated herein. It is accordingly so ORDERED.