**William C. BRACH, Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

**No. 80 C 4197.**

United States District Court,
N.D. Illinois, E.D.

Sept. 19, 1983.

William M. Doty, Jr., Chicago, Ill., for plaintiff.

Jeffery M. Cross and Gregory L. Dose, Ross & Hardies, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

William C. Brach ("Brach"), a lessee of a gasoline station owned by Amoco Oil Company ("Amoco"), sued Amoco for wrongful non-renewal of his franchise relationship under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2802. In turn Amoco filed a counterclaim (the "Counterclaim") seeking both possession of the station and damages, charging Brach had wrongfully refused to vacate the premises after the lease and franchise relationship had been properly terminated. After remand of the case from our Court of Appeals' partial affirmance and partial reversal of rulings by Judge Joel Flaum (see 677 F.2d 1213 (7th Cir.1982)), the action was assigned to this Court.

At this point the parties have filed three motions in connection with the Counterclaim:

1. Brach has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56(b).

2. Amoco has filed a "Submission in Support of Back Rent Calculation," which seeks recovery of increased rent regardless of the propriety of the franchise termination. That "Submission" will also be treated as a motion for partial summary judgment on the Counterclaim under Rule 56(a).

3. Brach has moved for a jury trial on the issues posed in the Counterclaim.

For the reasons stated in this memorandum opinion and order, the first motion is denied and the second and third motions are granted.

### Facts [1]

Beginning in 1963 Brach and Exxon Company, U.S.A. ("Exxon") entered into a series of renewable one-year leases under which Brach operated a retail service station in Winfield, Illinois as an Exxon franchisee. Exxon last renewed the franchise November 1, 1976. By a succession of assignments, Exxon's interest in the premises was conveyed to Amoco in August 1977. Dissatisfied with Brach's upkeep of the station and the unprofitability of the relationship, Amoco notified Brach the lease would not be renewed upon its November 1, 1977 expiration but would be extended six months (to May 1, 1978) to afford Brach time to relocate his business.

Brach refused to surrender the premises on the May 1 expiration date, instead continuing his service station business as well as his monthly rental payments. Having already accepted Brach's rent for May, Amoco sent the following May 25, 1978 letter to Brach (emphasis added):

> Please refer to your lease covering subject premises dated 11/1/76, which expired on 11/1/77 and which has been held over on a *month-to-month basis*. The purpose of this letter is to inform you that we do not elect to continue the existing lease arrangement with you and hereby cancel said lease effective June 30, 1978.

In a June 29 letter Amoco advised Brach it was obligated to continue gasoline deliveries pursuant to Department of Energy regulations but such deliveries would not constitute "a waiver of Amoco's demand for possession of the premises effective June 30." In August Amoco sent another letter to Brach informing him of a rent increase.

1. This factual account is drawn almost entirely from the factual presentation by our Court of Appeals, 677 F.2d at 1215–16, which presumably was based on undisputed facts (the appeal concerned cross-motions for summary judgment).

Amoco later rescinded that rent increase (before it went into effect), continuing to accept Brach's rental payments (as prescribed in the original lease).

Some time in 1979 Amoco began negotiations for sale of the property to Brach, assertedly to enhance the profitability of their franchise relationship. Those negotiations eventually culminated in a binding real estate contract. Brach however was unable to secure the necessary financing, and in January 1980 he informed Amoco of his inability to consummate the transaction. On February 7, 1980 Amoco sent Brach a notice to quit the premises by May 31, 1980. Amoco enclosed a summary of the relevant portions of PMPA and explained Brach's inability to purchase the premises had prompted its decision to sever their franchise relationship. Brach again refused to leave the premises, and to date he remains in possession of his station.

Throughout the entire period Brach has been paying Amoco rent based on the per-gallon rate set in the 1976 Exxon lease agreement. Amoco never attempted to bring Brach into its Facility Value Rent Program (the "Program"). Under the Program Amoco (beginning in 1976) modified the rental provisions in its dealers' lease agreements in accordance with a nondiscriminatory nationwide formula calling for fixed monthly rental payments (rather than variable rent based on the number of gallons sold).[2]

### Procedural Background

On July 25, 1980 Amoco filed a forcible detainer action in the Circuit Court of Du-Page County, Illinois. Brach promptly filed this suit seeking an injunction against non-renewal, punitive damages and attorney's fees. Brach's Complaint asserted Amoco violated PMPA by failing to give a proper reason for and notice of nonrenewal. Amoco then filed the Counterclaim.

Judge Flaum (to whom the case was originally assigned) granted Brach's motion for summary judgment on the nonrenewal issue as well as his motion to dismiss the Counterclaim for lack of subject matter jurisdiction. Judge Flaum also granted Amoco's motion for summary judgment on the issues of (1) its compliance with the PMPA notification requirements and (2) the availability of mandatory injunctive relief under PMPA. Underlying those rulings of course was Judge Flaum's determination that PMPA governed the propriety of Amoco's nonrenewal. That determination in turn was based on an express finding that a *month-to-month* holdover tenancy had existed on the effective date of PMPA—June 19, 1978. Both parties cross-appealed, and during the pendency of that appeal Amoco voluntarily dismissed the state court action.

Our Court of Appeals upheld Judge Flaum's ruling as to the applicability of PMPA, specifically affirming his finding concerning the existence of a month-to-month tenancy at PMPA's inception (677 F.2d at 1217–18). It also upheld Judge Flaum's disposition of the notice issue (*id.* at 1219, 1225–26). However the Court reversed Judge Flaum's ruling that Amoco's nonrenewal was unjustified under PMPA, discerning a genuine factual issue as to the propriety of Amoco's action (*id.* at 1219–24). Finally, the Court disagreed with Judge Flaum's characterization of the Counterclaim as permissive rather than compulsory and therefore concluded it was within the District Court's ancillary jurisdiction (*id.* at 1226).

### Amoco's Motion [3]

Damages sought by the Counterclaim can be justified under one of two alternative theories:

   1. If Amoco properly refused to renew Brach's franchise (and lease), Brach is liable for any resulting damages since the expiration date.

---

**2.** Amoco's formula was designed to produce a rental amount that would assure a 6% annual after-tax return on Amoco's total investment in the service station concerned.

**3.** This section of this opinion plagiarizes freely from this Court's recent decision in *Murphy v. Texaco, Inc.,* 567 F.Supp. 910 (N.D.Ill.1983), which disposed of a similar claim.

2. If the franchise relationship were improperly terminated, Brach is liable for the rent he would have been charged as a franchisee.

Regardless of which theory governs, there is no factual dispute that defeats Amoco's entitlement as a matter of law to the same accrued amount: the difference between (1) the rent Amoco would have charged any franchisee (at the facility in question) under the Program since the supposed May 31, 1980 termination date and (2) the rent actually paid by Brach.

■ Under Illinois common law an individual "who, after rightfully being in possession of rented premises, continues in possession after his right to such possession has terminated" is a tenant at sufferance (24 I.L.P. Landlord and Tenant § 68, at 197 (1980)). At the sole option of the landlord, a tenant at sufferance may be evicted as a trespasser or treated as a holdover tenant bound by the terms of the expired lease and any amendment unilaterally imposed by the landlord so long as advance notice is given (id. §§ 127, 128, at 231–33). But once the landlord has exercised that option it may not alter its election (id. § 129, at 234). When Brach remained in possession after the original May 1, 1978 expiration date, he became a tenant at sufferance. However, as both Judge Flaum and the Court of Appeals (677 F.2d at 1218) found,[4] Amoco continued to accept Brach's monthly rental payments, creating a month-to-month holdover tenancy. And that tenancy concededly was not terminated before May 31, 1980. During that period Amoco never unilateral-

ly raised the rent, as was its prerogative, by providing 30 days' advance notice. Consequently before May 31, 1980 Brach incurred no liability over and above the rent payments he was making.

■ Under the Counterclaim's first alternative theory, Brach again became a tenant at sufferance after that asserted termination date. This time Amoco opted to treat Brach as a trespasser[5] rather than a holdover tenant.[6] Under those circumstances, Amoco would be entitled to any damages resulting from Brach's wrongful possession. Such damages include recovery for any rental income Amoco could have obtained during the post-termination period—an amount based on the then-prevailing market rental rate.

■ Fair market rental is of course a fact question. On that score Amoco has made, as its showing, proof of the rental rates it would have charged under the Program. Those rent levels are at least prima facie evidence of market rentals (see *Murphy,* at 913), particularly in view of the uniform acceptance of the Program (and its nondiscriminatory rent formula) by Amoco dealers across the country. And given Brach's failure to proffer *any* other evidence on the issue, the Program evidence is dispositive in Rule 56 terms.

Amoco's second alternative theory leads to the identical conclusion. As Amoco's Hough Aff. ¶ 4 conclusively shows, Amoco would have increased Brach's rent in accordance with the Program had its franchise relationship with Brach not been ex-

---

**4.** Law of the case considerations render the month-to-month tenancy and holdover findings binding on this Court. Brach's effort to relitigate the identical issues now is an imposition on opposing counsel and this Court, and Brach is ordered on or before September 30, 1983 to file a memorandum as to why, under relevant standards, he should not be required to pay Amoco's attorneys' fees and costs for being forced to brief the matter (see Amoco Mem. at 1 n. 1).

**5.** Amoco's actions leave no doubt on that score:
1. Shortly after May 31 it began eviction proceedings against Brach.

2. Throughout this lawsuit it has taken the position Brach is a trespasser.
Amoco's routine "All Amoco Dealers" communications to Brach (Brach July 1983 Aff. Exs.) are no more than a recognition it was stuck with Brach as an unwanted franchisee in possession while this lawsuit remains pending. Dale Kohlman July 26, 1983 Aff.

**6.** Amoco's acceptance of Brach's rent payments since May 31 does not operate to create a holdover tenancy, for Amoco expressly conditioned that acceptance on its right to continue to object to Brach's possession of the premises. See *id.* § 129, at 235.

tinguished. Amoco's failure to alter Brach's rental obligations since the May 31, 1980 termination date stemmed from its good faith and reasonable belief such action would compromise the position it had taken in this proceeding—that Brach continues to occupy the premises as a trespasser, not as a holdover tenant.[7] Moreover Amoco's inaction could not have unfairly prejudiced Brach, for the Program's applicability to Brach is simply one aspect of the franchise relationship, the preservation of which is the very objective of his lawsuit.[8] Indeed barring Amoco from back rent recovery (if the franchise relationship is found to be still in force) would unjustly ·enrich Brach, allowing him to exploit the rights of a franchisee while escaping the concomitant obligations.[9]

In sum, the numbers are the same under either theory of recovery—though the rationale may differ. Amoco is entitled to an amount equal to the full rent it would have charged Brach (or a new franchisee at the facility) under the Program beginning June 1, 1980. Amoco's uncontroverted Hough Aff. ¶ 4 sets forth the computational basis for Brach's back rent liability through June 1983:

> 1. Had the decision to base Brach's (or the new franchisee's) rent in the Program's formula been made May 31, 1980, he would have been cycled into the Program in November 1980.
>
> 2. Brach's Program rent during the period from November 1980 through June 1983 would have totaled $35,704.
>
> 3. During that period Brach's actual rent payments were $10,081.85.

Accordingly Brach is liable for (1) $25,627.15 ($35,704 minus $10,081.85) plus (2)

the difference between the rent due under the Program from July 1, 1983 to the present time and the actual rent remitted by Brach during that period.

### Brach's Summary Judgment Motion

Brach contends he is entitled to summary judgment on the Counterclaim because Amoco's February 7, 1980 notice to quit the premises was not proper under Illinois law. Brach advances several arguments to support that position:

> 1. By accepting Brach's rent after the November 1, 1977 expiration of the lease Amoco created a year-to-year rather than a month-to-month holdover tenancy. That characterization of the tenancy would render Amoco's February 7 notice to quit the premises defective for two reasons:
>
>> (a) Notice was not given within the four months preceding the last 60 days of the end of the holdover tenancy (October 31, 1980), as required by Ill.Rev. Stat. ch. 80, § 5.
>>
>> (b) Amoco's notice called for possession on May 31—well before the end of the year-to-year term.
>
> 2. Even if timely, the notice was later waived by Amoco's voluntary dismissal of its forcible entry action in state court.

Those arguments are simply untenable.

■ Most significantly, Brach's contentions mistakenly presume the applicability of Illinois' notice requirements for terminating lease arrangements. As the unequivocal language of PMPA § 2806 makes clear, PMPA's notice provisions, Section 2804(c) in this case, have preempted those inconsistent state law requirements:

---

**7.** Because the correctness of that belief is irrelevant for present purposes, this opinion expresses no views on that score.

**8.** That factor alone compels rejection of Brach's laches contention in opposition to an increase in his prior rent payments. Limiting such back rent recovery to the post-termination period (which is approximately equal to the duration of this lawsuit) further undercuts that argument, for Brach would be hard pressed to establish his lack of notice as to the possibility

of a back rent counterclaim based on the Program.

**9.** This reasoning however does not justify imposing liability on Brach in connection with his *pre*-May 31, 1980 rental responsibilities, as Amoco apparently suggests. Amoco acknowledged the validity of Brach's month-to-month holdover tenancy before that date. Therefore Amoco's failure to seek a rental increase during the pre-termination period manifested a deliberate decision to forego its right to do so.

[N]o State ... may adopt, enforce, or continue in effect any provision of any law ... with respect to termination (or the furnishing of notification with respect thereto) of any ... franchise or to the *nonrenewal* (or the *furnishing of notification* with respect thereto) of any ... franchise relationship unless such provision of such law ... is the same as the applicable provision of this subchapter.

Thus the propriety of Amoco's notice to quit hinges solely on Section 2804(c).[10] And our Court of Appeals (677 F.2d at 1226) definitively resolved that issue in its earlier opinion, finding Amoco had complied with those notice provisions in all respects. That determination is also binding on this Court as law of the case.

In any event, Amoco's notice was proper under Illinois law. Brach's first two claimed deficiencies in the notice are based on the flawed assumption the holdover tenancy had a year-to-year rather than month-to-month term, but:

1. As already discussed, law of the case considerations constrain this Court to find a month-to-month tenancy, for both Judge Flaum and the Court of Appeals held precisely that.

2. This Court would reach the same conclusion as an original matter. Under Illinois law a landlord can unilaterally change the terms by which a holdover tenant will be bound by notifying the tenant before the holdover term begins. Even when interpreted in the light most favorable to Brach, the record conclusively shows Amoco had exercised its amendatory power to contract the holdover term to month-to-month as of not later than November 1, 1978:

(a) Before the November 1, 1977 expiration of the one-year lease, Amoco told Brach he could continue in possession up to six additional months. Though that might be read as establishing a month-to-month tenancy (thus defeating Brach's contention at the outset), it might arguably creating a holdover term of six months (rather than one month).

(b) On the latter more favorable construction, Amoco arguably allowed Brach to hold over for another six month term (from May 1 through November 1, 1978) by accepting Brach's rent for May 1978. Amoco's statement in the May 25, 1978 letter that the original lease "has been held over on a month-to-month basis" would have been made too late to effect the duration of that holdover term.

(c) However, that letter certainly provided Brach the requisite advance notice to confine his *subsequent* holdover tenancy to a month-to-month arrangement. And his staying on in possession thereafter without cavil at the term forecloses his present assertion.

Brach's final argument—that Amoco waived its notice to quit by voluntarily dismissing its state court action—makes no sense. As already observed, that action involved precisely the same forcible detainer issues posed by the Counterclaim. Amoco's decision to dismiss the state court lawsuit merely reflected its preference to have its eviction claim tried in the same federal forum in which Brach chose to bring his suit. This Court fails to perceive how such a decision could have "waived" Amoco's earlier notice to vacate. In view of Brach's failure to proffer any supporting authority, this Court must reject his bizarre waiver theory.[11]

10. This plain reading of Section 2806 to preempt Illinois' notice prerequisites in a forcible detainer action (involving a service station franchise lease) does not, as Brach contends, compel the conclusion that Section 2806 extinguishes the forcible detainer remedy itself. Because the mere availability of that remedy does not conflict with any PMPA provision, it escapes Section 2806's scalpel. Moreover a contrary conclusion would subvert PMPA's overarching policy objective: "to strike a *balance* between the interests of the participants in a petroleum market franchise relationship." *Brach,* 677 F.2d at 1220 (emphasis added). If deprived of a forcible detainer remedy, franchisors would be powerless to evict properly-terminated franchisees, for they (unlike franchisees) have no right of action directly under PMPA. Surely Section 2806 was not intended to produce such an anomalous result.

11. Because law of the case so plainly applies to this issue as well and because of the total

### Jury Demand

In tandem, Rules 38(b) and 39(b) define the circumstances under which a party may obtain a jury trial:

    1. Under Rule 38(b) a party is entitled to a jury trial on an issue if he makes a written request "at any time after the commencement of the action and not later than ten days after the service of the last pleading directed to such issue."

    2. Rule 39(b) permits "the court in its discretion upon motion [to] order a trial with a jury of any or all issues" despite the lack of a timely demand. To qualify for such discretionary relief in this Circuit, the delinquent party must at least proffer inadvertence as the justification for his tardiness. See *Merritt v. Faulkner,* 697 F.2d 761, 767 (7th Cir.1983); *G. Bauknecht GmbH v. Electronic Relays, Inc.,* 569 F.Supp. 404, 415 (N.D.Ill.1983).

Brach has moved for a jury trial on the issues posed by the Counterclaim. Believing his jury demand to be untimely under Rule 38(b), Brach invokes Rule 39(b).

As Amoco forthrightly acknowledges, Brach's assumption is incorrect, for his Answer to the Counterclaim—the "last pleading" directed to the Counterclaim issues—included a request for a jury trial. Hence, Brach has a *right* to a jury trial on the Counterclaim.

That undeniable right, however, is only a single-fact-issue right at this point. As the parties' currently-filed final pretrial order reflects, now that Amoco's damage claim has been resolved as a matter of law by this opinion, the only remaining Counterclaim question is Amoco's right to possession. And because Amoco's title to the property is highly unlikely to pose any dispute,[12] all that is probably in issue is the propriety under PMPA of Amoco's nonrenewal.

Such propriety is a factual issue common to Brach's Complaint and Amoco's Counterclaim (see 677 F.2d at 1219). In that situation *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959) and its progeny[13] teach a jury must address that issue before this Court goes on to decide the other issues in the Complaint in light of the jury verdict. Because Brach's motion expressly declined to make a tardy request for jury trial on the Complaint issues[14] (though Brach is "willing" to have those issues tried by a jury), the procedure contemplated at trial will involve convening a jury and obtaining a special verdict under Rule 49(a), then proceeding to a bench trial on the Complaint.

### Conclusion

Brach's summary judgment motion is denied and his motion for a jury trial on the Counterclaim is granted. Amoco's motion for damages in the form of back rent is granted.

---

poverty of Brach's other arguments, his next memorandum (see n. 4) is ordered to address the briefing on his summary judgment motion too.

**12.** Though the final pretrial order does not identify title as an uncontested fact, many of the stipulated uncontested facts effectively concede Amoco's title (or, more accurately in a possessory action, concede Brach's possessory rights to be wholly derivative from Amoco). Neither party lists title as a contested fact.

**13.** *See, e.g., Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 900–01, 8 L.Ed.2d 44 (1962); and see discussion in 9 Wright & Miller, *Federal Practice and Procedure* § 2338 (1971).

**14.** Indeed Brach has not even attempted to make the threshold showing of inadvertence contemplated by Rule 39(b). See *Bauknecht,* slip op. at 415 (necessity of proof in affidavit form to show adequate excuse for delinquency).