ENTER.

### Robert V. STUART

v.

### EXXON COMPANY, U.S.A., A DIVISION OF EXXON CORPORATION.

#### Civ. A. No. 1–85–58–K.

United States District Court,
N.D. Texas,
Abilene Division.

Aug. 26, 1985.

Jeffry F. Thomason, Todd, Barron & Bridges, Odessa, Tex., for plaintiff.

William R. Hurt, Peggy Donley, Exxon Co., U.S.A., Houston, Tex., for defendant.

## MEMORANDUM OPINION

BELEW, District Judge.

Plaintiff in the above-styled and numbered cause has moved the Court for a preliminary injunction restraining Defendant from taking any action interfering with Plaintiff's operation of his franchised Exxon station, as well as a Court order compelling continuation of Plaintiff's franchise relationship with Defendant. Defendant has filed extensive opposition papers as well as a Motion for Summary Judgment, to which Plaintiff has responded, claiming it is entitled not to renew Plaintiff's franchise as a matter of law. Having carefully considered the pleadings and all supporting documentation filed therewith, the Court finds that there exists no genuine issue as to any material fact nor any serious questions going to the merits which would make such questions a fair ground for litigation. We, therefore, deny all relief requested by Plaintiff and grant summary judgment to Defendant for the reasons hereinafter stated.

The agreements between Plaintiff and Defendant in this matter constitute a "franchise" as that term is defined in Section 15 of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801(1). Because the PMPA governs this cause of action, we will begin our analysis by outlining some of its relevant portions.

The PMPA is a comprehensive regulatory scheme governing the circumstances under which a franchisor may terminate a franchise relationship with a franchisee. See 15 U.S.C. §§ 2801–2806 (1982). Pursuant to this Act, a franchisor may terminate or fail to renew a franchise relationship only in accordance with very specific notice requirements [1] and for one of the reasons expressly listed by the statute.[2]

---

**1.** These notice requirements are set forth at 15 U.S.C. § 2804. *See infra* at pp. 652–53.

**2.** The grounds for termination and nonrenewal are fully set forth at 15 U.S.C. § 2802(b).

Among other reasons, a franchisor may terminate or not renew a lease based on: (1) "a failure by the franchisee to comply with any provision of the franchise ..."[3]; (2) "a failure by the franchisee to operate the marketing premises in a clean, safe and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures"[4]; and (3) a good faith determination by the franchisor "that renewal of the franchise relationship is likely to be uneconomical to the franchisor ..."[5].

If the franchisor seeks not to renew on the ground of failure to operate in a clean and safe manner: "it is intended that a course of conduct indicating the unsuitability of the franchisee to continue operation should be demonstrated by the failures, the repeated notices from the franchisor to the franchisee seeking proper operation and the continued failure of the franchisee to operate the premises in the desired manner." *Frisard v. Texaco, Inc.*, 460 F.Supp. 1094, 1101 (E.D.La.1978) (citing legislative explanation of PMPA).

The PMPA expressly grants the Court the power to award mandatory or prohibitive injunctive relief. According to Section 2805(b)(2):

> [T]he court shall grant a preliminary injunction if (A) the franchisee shows (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, *and* (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; *and* (B) the court determines that, on balance, the hardships imposed upon the franchisor by the

issuance of such preliminary injunctive relief will be less than the hardship which would be imposed on the franchisee if such preliminary injunctive relief were not granted.[6]  (emphasis added)

We shall now set forth the factual context to which these legal principles are applicable.

In 1977, Plaintiff entered into the first of a series of contractual agreements with Defendant whereby he was to operate the Exxon service station located at Interstate 20 and FM Road #540 in Eastland, Texas. His initial lease as well as his most recent one provided that Plaintiff, as lessee, agrees: ... "(c) to keep the premises, including buildings, driveways, and ramps in a clean, sanitary and orderly condition; (d) to operate the business conducted on the premises in a safe and orderly manner allowing no fire hazards, unsanitary or dangerous conditions to exist."[7]

On March 19, 1981, Mr. B.J. Calfee of Exxon's Marketing Department, Midland District, inspected Plaintiff's station and completed an "Appearance Inspection" report.[8]  The report reflects a general lack of maintenance of the station which was little improved by August 4, 1981, when a second inspection was performed.[9]  By letter dated August 6, 1981, Mr. Calfee advised Plaintiff that his lease required him to keep the premises in a clean, sanitary, orderly and safe condition.[10]  Additionally, Mr. Calfee offered assistance to help Plaintiff correct the then current problems.

On August 27, 1981, Hubert S. Hays, Jr., a Marketing Representative with Exxon, did a follow-up inspection of Plaintiff's premises.  In his September 1, 1981 letter to Plaintiff he noted no improvement in the

---

3. 15 U.S.C. § 2802(b)(2)(A).

4. 15 U.S.C. § 2802(b)(3)(C).

5. 15 U.S.C. § 2802(b)(3)(D)(i)(IV).

6. 15 U.S.C. § 2805(b)(2).

7. *See* Defendant Exxon Corporation's Memorandum of Law in Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defendant's Motion"), Exhibit 1.

8. *See* Defendant's Motion, Exhibit 3.

9. *See id.,* Exhibit 5.

10. *See id.*

cleanliness and safety of the station. He reminded Plaintiff that he was in violation of his lease, and was risking termination or nonrenewal of the lease because of the unclean and unsafe condition of the premises. Once again, assistance in correcting the problems was offered.[11]

At about this time, Exxon began considering the question of whether or not to renew Plaintiff's lease because the lease term was to expire in April of 1982. Exxon finally decided to renew the lease despite the problems Plaintiff was having in properly maintaining the station. As Mr. Hays has stated by affidavit:

> It was decided that Mr. Stuart should be given the benefit of the doubt and given an opportunity to correct the substandard conditions at his service station. At the time I presented his new contracts to him in early 1982, I met with Mr. Stuart at some length and reviewed the terms of the contracts with him in detail. Particular emphasis was placed upon those provisions of his lease agreement which required him to maintain the premises in a clean, sanitary and orderly manner. Mr. Stuart assured me in no uncertain terms that he understood what was expected of him and that he would take the necessary steps to correct the problem. On the basis of those assurances, Exxon entered into the March 5, 1982 retail service station lease and accompanying sales agreement with Mr. Stuart.[12]

The new lease term was to expire on May 1, 1985.

Mr. Calfee inspected the station again on April 20, 1982 and found some improvement in its appearance. Mr. Hays informed Plaintiff of this fact by letter dated April 23, 1982.[13] However, Mr. Hays noted that "the store is still not up to the stan-dards which we discussed in my office several weeks ago." A reinspection was planned for May 10, 1982 and once again, Mr. Hays requested that Plaintiff contact him for assistance.

The May 10, 1982 inspection revealed limited improvement.[14] However, the uncorrected conditions became significantly worse by the time Exxon inspected again on July 14, 1982. Indeed, Exxon's July 17, 1982 letter to Plaintiff, which lists the maintenance problems in great detail, is reminiscent of the very first letter Plaintiff received back in March of 1981. Again, assistance was offered and a new inspection was set for July 19, 1982.[15] The July 19, 1982 inspection revealed little or no improvement and this fact was communicated to Plaintiff in an August 10, 1982 letter.[16]

On December 2, 1982, Exxon wrote to Plaintiff regarding inspections performed on October 21, 1982 and November 19, 1982, stating "your station's appearance on both occasions ... (is) completely unacceptable." Again, Exxon offered assistance.[17] Mr. W.T. Parker, also of Exxon's Marketing Department, apparently inspected the station again on February 2, 1983 and August 24, 1983. By a letter dated August 31, 1983 to Plaintiff, he stated in reference to those two inspections "(I) again found the appearance and cleanliness of your store deplorable."[18] Plaintiff was again reminded that he was in serious violation of his lease and that if he failed to make improvements "your lease may not be renewed as provided by the Petroleum Marketing Practices Act."[19]

On April 12, 1984 and September 13, 1984, similar letters were sent to Plaintiff revealing equally poor inspection results.[20] On January 17, 1985, Plaintiff was sent

---

11. *See id.,* Exhibit 6.

12. *See* Affidavit of Hubert S. Hays, Paragraph 7.

13. *See id.,* Exhibit 10.

14. *See id.,* Exhibit 11.

15. *See id.,* Exhibit 12.

16. *See id.,* Exhibit 13.

17. *See id.,* Exhibit 16.

18. *See id.,* Exhibit 17.

19. *See id.*

20. *See id.,* Exhibit 21.

formal written notice that his lease would not be renewed effective 12:00 Noon on May 1, 1985.[21] The letter stated in pertinent part:

Our reason for taking this action is that you failed to maintain the premises in a clean, safe and healthful manner.... Each of our (post-inspection) letters set out specific items needing prompt corrective action. You failed to reply to these letters; and despite these requests from Exxon Sales personnel, this situation has persisted. Also, you have failed to supply proof of insurance on these premises, since your insurance expired in May. The basis for nonrenewing your franchise relationship is found under Section 2802(b)(3)(C) of the Petroleum Marketing Practices Act.... Also, in paragraphs 6(c) and (d) of your lease, you agreed to 'keep the premises (safe).'

The letter further advised Plaintiff of the Exxon Dealer Grievance Procedure, a system which allows dissatisfied dealers to present their grievances to up to three different reviewing bodies, all made up of Exxon personnel at different echelons of the corporate hierarchy.[22]

Plaintiff requested and was granted an initial review of the decision not to renew at what is referred to by Exxon as the "area level." At that level, Plaintiff met with Mr. Terry, Area Manager, Mr. Hays and Mr. Parker who discussed Plaintiff's grievances with him. By letter dated February 12, 1985, Mr. Terry informed Plaintiff that the panel had decided to deny his request to have a new three year lease. In that letter, Plaintiff was informed that he could seek review of this decision on a regional level by a Regional Dealer Relations Committee, a committee of field managers who would have had no prior involvement with Plaintiff's grievance.[23]

Plaintiff sought review at this second level but was again denied his requested relief by letter dated April 8, 1985. In that letter, Plaintiff was informed of the final level of review that he could seek, namely the Headquarters Dealer Relations Committee.[24]

Plaintiff proceeded to seek a hearing with the Headquarters Dealer Relations Committee, the final recourse under Exxon's grievance procedure. By letter dated April 25, 1985, he was granted a hearing along with an extension of the lease term until June 1, 1985.[25] On May 30, 1985, Plaintiff filed the instant lawsuit. By letter dated June 6, 1985, Exxon informed Plaintiff that the decision for nonrenewal was confirmed and that Plaintiff would have until July 1, 1985 to surrender the premises.

On June 26, 1985, this Court conducted a hearing on this matter, wherein the parties stipulated to the necessity of a temporary restraining order for sixty days or until the date of this Court's decision, whichever would come first. It is in this factual context that we now apply the principles of the PMPA discussed earlier.

We find that Defendant's decision not to renew Plaintiff's lease agreement was in full compliance with the PMPA. The notice was hand delivered in writing more than ninety days prior to the date on which nonrenewal was to take effect, it contained a statement of intention not to renew, the date on which nonrenewal would take effect and the summary statement prepared by the Department of Energy. Hence, the notice was effected exactly as the PMPA requires. *See* 15 U.S.C. § 2804; *Cf. Escobar v. Mobil Oil Corp.,* 678 F.2d 398, 400 (2d Cir.1982); *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1225–26 (7th Cir.1982) *rem'd,* 570 F.Supp. 1437 (N.D.Ill. 1983).

Plaintiff argues that the notice was rendered unclear, untimely and hence, defective by Exxon's reference in the January

**21.** *See id.,* Exhibit 20.

**22.** *See id.,* Exhibit 20.

**23.** *See id.,* Exhibit 22.

**24.** *See id.,* Exhibit 21.

**25.** *See id.,* Exhibits 25, 26.

17, 1985 letter to an alleged failure by Plaintiff to provide insurance.[26] We disagree. First of all, in his deposition testimony, James Terry has made clear that the only reason for nonrenewal is the cleanliness and safety problems.[27] Secondly, even if notice as to Plaintiff's lack of insurance is defective, this fact does not render defective the notice that Defendant gave regarding the cleanliness and safety problems. *See Brown v. American Petrofina Marketing, Inc.*, 555 F.Supp. 1327, 1334–35 (M.D.Fla.1983), *aff'd without opinion*, 733 F.2d 906 (11th Cir.1984).

Defendant's decision was also in compliance with the provisions of the PMPA requiring that nonrenewal be premised on stated statutory grounds. In fact, Defendant specifically cited two statutory grounds for nonrenewal, lack of cleanliness and safety, and violation of lease provisions. *See* Defendant's Motion, Exhibit 20; 15 U.S.C. §§ 2802(b)(2)(A), (b)(3)(C). As to the lack of cleanliness, Plaintiff failed to operate the premises in a clean, safe and healthful manner on more than two occasions prior to his receipt of the January 17, 1985 letter, and Plaintiff was notified of these failures.

Plaintiff challenges the grounds for termination by arguing that the station in fact was clean. He has gone to considerable lengths to convince the Court that his station was as clean and safe as any in its area. He has furnished the Court with the affidavits of three of his employees stating that the station is maintained to the best of their ability, photographs of two "Exxon-owned" stations around Eastland as they appeared on July 17, 1985,[28] photographs of non-Exxon owned service stations in the Eastland area as they appeared on July 14, 1985,[29] and a set of some one hundred completed questionnaires asking customers about the cleanliness of the service station.[30]

In its opposition papers, Defendant has furnished the Court with affidavits of Hubert S. Hays, Jr. and James E. Terry, a series of photographs of Plaintiff's station as it appeared at different times from August 17, 1981 through July 1, 1985,[31] and photographs of the Exxon station in Cisco, Texas as it appeared on July 1, 1985.[32]

While the Court has carefully reviewed all the documentation it has been supplied on the issue of cleanliness and safety, we find that the photographs are the most telling evidence and that of the sets of photographs we have reviewed which depict the upkeep of the various stations in the Eastland area from the point of view of grease on the pavement, unmowed lawns, unclean bathrooms and general clutter, Plaintiff's station is comparatively badly maintained.[33]

Plaintiff's riposte is that Defendant itself has caused some of the maintenance problems at the service station by failing to repair certain fixtures or equipment in violation of the lease agreement.[34] First of

---

26. *See* Plaintiff's Brief in Support of Complaint for Injunctive Relief ("Plaintiff's Brief"), pp. 12–13.

27. Deposition of James E. Terry, p. 31, lines 3–6, p. 47, line 20, p. 48, line 17.

28. *See* Affidavit of Robert V. Stuart, Exhibit A.

29. *See id.*, Exhibit B.

30. *See id.*, Exhibit C. Additionally, Plaintiff has submitted transcripts of the deposition testimony of James E. Terry and Hubert S. Hays, Jr.

31. *See* Affidavit of Hubert S. Hays, Jr., Exhibit 1.

32. *See id.*, Exhibits 2 and 3. Additionally, Defendant has submitted transcripts of the deposition testimony of Robert V. Stuart.

33. The conditions of an Exxon station in Bronte, Texas also rate low in terms of cleanliness of the restrooms. Defendant informs the Court that this station is now closed. Affidavit of Hubert S. Hays, Jr., paragraph 15.

34. *See* Affidavit of Robert V. Stuart, paragraph 11. Paragraph 7(a) of the lease agreement provides in pertinent part:

Exxon agrees at its own expense, to make all repairs (which Lessee is not required under Section 6 hereof to make) to the premises leased hereunder upon written notice from Lessee to Exxon ...; provided, however, that such repairs are, in Exxon's sole judgement (sic), necessary in consideration of the remaining term of the lease or have not been caused by negligence of or misuse of Lessee ...

all, Plaintiff, by his own admission, never made requests for repairs in writing as the lease required.[35]

Moreover, Plaintiff acknowledged at his deposition, taken eleven days before he swore out his affidavit, that he had no reason to believe that Exxon's failure to renew his contracts were a result of the failure of Exxon to repair any of the items that the lease obligates it to repair.[36]

Finally, the photographs of Plaintiff's station reveal that many of the cleanliness problems such as the general clutter, trash and unmowed lawns, have nothing to do with any repairs that Defendant could conceivably make. *See Azcuy v. Amoco Oil Co.,* No. C85–1884A, slip op. at 7 (N.D.Ga. June 11, 1985) (unpublished).

Plaintiff also suggests that Exxon's inspection methods are unfair, stating: "Exxon uses impromptu 'sales calls' by its field representatives, who drop by in order to take pictures of work in progress and occasionally fill out a report based, at best, on their opinion of what they see." [37] We reject this argument as well. First, many of the inspections were not "impromptu" at all, but rather were scheduled for a specific date,[38] a fact which would have allowed Plaintiff to clean up the station specifically for the inspection, had he been so motivated. Furthermore, the completion of inspec-

tion reports was hardly "occasional". Defendant has submitted ten such reports for the Court's consideration.[39]

Most importantly, in Plaintiff's own words "cleanliness or noncleanliness is subjective, ... opinion instead of fact." [40] The Court can think of no other way of enforcing the statutory standard of cleanliness and safety other than sending inspectors to the stations to determine their condition. The Exxon inspectors had objective criteria by which to examine Plaintiff's station as set forth in the Appearance Inspection forms, and the problems found on each occasion were clearly set forth.[41] We find that Defendant's evaluation procedures were extremely fair to Plaintiff.

Plaintiff's final argument suggests that his lease was not renewed because his service station was not as profitable to Exxon as other stations and therefore, Exxon was using cleanliness and safety as an excuse to lease the station over to a distributor who would then be responsible for the day to day management of the station, thereby relieving Exxon of that burden.[42]

We are wholly unpersuaded by this argument primarily because the PMPA expressly allows a franchiser to terminate an unprofitable franchise if the franchisor has determined lack of profitability in good faith.[43] Hence, Defendant would have no

*See* Deposition of Robert V. Stuart, Exhibit 1.

**35.** *See id,* p. 204, lines 22–25. Nevertheless, Plaintiff's Exxon sales representative Mr. Hubert Hays would try to provide Plaintiff with verbally requested repairs. *See* Affidavit of Hubert S. Hays, Jr., paragraph 13.

**36.** *See* Deposition of Robert V. Stuart, p. 165, lines 4–9.

**37.** Plaintiff's Brief, p. 8.

**38.** *See, e.g.,* Defendant's Motion, Exhibits 10, 11 and 12.

**39.** *See* Defendant's Motion, Attachments to Exhibits 6, 11, 13, 15 and 16.

**40.** *See* Plaintiff's Brief, p. 13.

**41.** Throughout his pleadings, Plaintiff places heavy emphasis on his attempts to correct the maintenance problems brought to his attention.

*See, e.g.,* Affidavits of Joy Rose, Roger Reep and Johnny Rose; Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment, pp. 1, 7.

Whatever improvements were made were apparently not done on any long term basis since: (1) letters indicating problems were sent to Plaintiff on a regular basis up until Plaintiff was notified of Exxon's intention not to renew; and (2) Exxon evidently took care to note improvement in its letters to Plaintiff when it found improvement. *See e.g.,* Defendant's Motion, Exhibit 10. Very few of the letters attached to Plaintiff's Motion reflect that improvements had been made.

**42.** *See* Plaintiff's Brief at p. 17–19.

**43.** *See* 15 U.S.C. § 2802(b)(3)(D)(i)(IV). *See supra,* p. 650.

reason to use a false pretense if unprofitability was in fact the reason it chose not to renew the franchise. *See generally, Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1222–24 (7th Cir.1982) (discussion of application of unprofitability rationale in PMPA cases) *rem'd* 570 F.Supp. 1437 (N.D.Ill. 1983).

 In conclusion, the physical condition of Plaintiff's station along with the repeated notices from Exxon to Plaintiff seeking proper operation and the continued failure of the Plaintiff to improve the condition of the premises in any permanent way over a three and a half year time period indicates that Exxon's decision not to renew is proper under Section 2802(b)(3)(C) of the PMPA. *See Saad v. Shell Oil Co.,* 460 F.Supp. 114 (E.D.Mich. 1978). Under these circumstances, we can find no serious questions going to the merits to make such questions a fair ground for litigation. *See Azcuy v. Amoco Oil Co.,* No. C85–1884A (N.D.Ga. June 11, 1985) (unpublished), *Cianfrocco v. Gulf Oil Corp.,* 594 F.Supp. 360, 363–64 (N.D.W.Va. 1984); *Saad,* 570 F.Supp. at 118.

Defendant has moved the Court for an award of attorneys' fees pursuant to Section 2805(d)(3).[44] Under that section, the Court may in its discretion award attorney's fees if we deem Plaintiff's action frivolous. We decline to find Plaintiff's action frivolous and therefore deny Defendant's request in this regard in all respects. *See Brown v. American Petrofina Marketing, Inc.,* 555 F.Supp. 1327, 1336 (N.D. Fla.1983) *aff'd without opinion,* 733 F.2d 906 (11th Cir.1984); *Cf. Zacharias v. Shell Oil Co.,* Business Franchise Guide (CCH) ¶ 8151 (E.D.N.Y.1984).

Plaintiff's request for injunctive relief is hereby denied and summary judgment is granted in favor of Defendant. Judgment will be entered with this opinion.

44. *See* Defendant's Motion, pp. 31–37.