347

CLERK OF COURT
SUPREME COURT. CNMI
FILED

90 SEP 17 P1: 31

BY

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| CARMEN LG. BORJA, | ) | APPEAL NO. 89-009 |
| | ) | CIVIL ACTION NO. 88-203 |
| Plaintiff/Appellee | ) | |
| | ) | |
| vs. | ) | OPINION |
| | ) | |
| LOURDES RANGAMAR, et al, | ) | |
| | ) | |
| Defendants/Appellants. | ) | |
| | ) | |

Argued March 29, 1990

Counsel for Defendants/Appellants:     Michael A. White, Esq.
                                        White, Novo-Gradac and Manglona
                                        P.O. Box 222 CHRB
                                        Saipan, MP  96950

Counsel for Plaintiff/Appellee:        Robert O'Connor, Esq.
                                        P.O. Box 1969
                                        Saipan, MP  96950

BEFORE: DELA CRUZ, Chief Justice, and HILLBLOM and KOSACK, Special Judges.

DELA CRUZ, Chief Justice:

This appeal is from a summary judgment order in an ejectment and quiet title action. The plaintiff, Carmen LG. Borja ("Borja"), prevailed against the individual defendants and the Marianas Public Land Corporation (MPLC). 3 CR 890 (C.T.C. 1989). The individual

defendants--Lourdes Rangamar, her husband Luis Rangamar and her mother, Clara T. Camacho (collectively "Rangamars")--have appealed. MPLC has not appealed.

Borja seeks to eject the Rangamars from disputed property over which she asserts title. She also seeks to establish the boundary between her property and a parcel of public land to the south administered by MPLC.

## BACKGROUND

The dispute ultimately concerns the proper boundary between Lots 1930 and 1933 in Garapan, Saipan. Borja owns the southern portion of Lot 1930. The adjoining parcel, Lot 1933, is public land administered by MPLC.

### Lot 1930: The Borja Property

Borja's late husband, Olympio T. Borja, acquired the southern portion of Lot 1930 from the heirs of Fabiana Rapugao in 1969.[1] When Olympio Borja died in 1986, Carmen LG. Borja acquired the property as his successor in interest.

### Lot 1933: The MPLC Property

Title to Lot 1933 was once held by the heirs of Francisco Somorang, with Clara T. Camacho ("Camacho") as land trustee. In 1954, Camacho entered into an agreement with the Trust Territory Government to exchange Lot 1933 for other land. The transfer was completed by quitclaim deed in 1956. As successor in interest to

---

[1] A technical error, not relevant to this case, was corrected in a new deed filed in 1970.

the Trust Territory Government, MPLC now holds title to the land.

Sometime in the late 1960s, the Rangamars moved onto Lot 1933. In 1971, the Trust Territory Government filed an action to eject the Rangamars from the property. In 1976, Camacho filed a separate action to quiet title to Lot 1933 in her name.

The 1971 ejectment action and the 1976 quiet title action were consolidated by the trial division of the Trust Territory High Court, which ruled in 1979 that the Trust Territory Government owned Lot 1933 and that Camacho had no right, title or interest in the property. She was ordered to vacate the premises. Camacho appealed; the judgment was affirmed in 1982. Trust Territory v. Camacho, 8 T.T.R. 273 (1982).

Despite the 1979 judgment and ejecment order, the Rangamars remained on Lot 1933 until a storm demolished their home. They then rebuilt their house some distance to the north, on land Borja claims is within the portion of Lot 1930 that she owns.

## The Asia Mapping Survey

In 1976, the Trust Territory Government contracted with Asia Mapping, Inc., to survey certain lands in the Northern Marianas. One product of the survey was Sketch No. 15, which indicates, inter alia, the boundary between lots 1930 and 1933.

## THE PRESENT ACTION

Borja filed this action in 1988. An amended complaint was filed in January of 1989. In June of 1989, she moved for summary judgment. Borja relied upon the boundary delineated in Sketch No.

15 to support her claim that the Rangamars had moved onto the portion of Lot 1930 that she owns. The Rangamars disputed the accuracy of the survey, contending that the true boundary was north of the indicated line.[2]

## Sketch No. 15

According to evidence presented at the summary judgment hearing,[3] the Asia Mapping surveyors began their survey by searching for available Japanese land documents. With respect to the area of Lots 1930 and 1933, they discovered two such documents, an index map and a railroad right-of-way map, neither of which were particularly helpful in establishing the boundary at issue. The surveyors found no record of any prior survey of the lots.[4] Next, the surveyors attempted to locate physical monuments indicating the boundary. None could be found. Finally, in keeping with the customary practice when land documents or monuments were unavailable, the surveyors consulted owners of privately-held adjoining properties.

When the Asia Mapping survey was conducted, Olympio Borja was the only private landowner whose property adjoined the boundary in question. The other property, Lot 1933, was then (as now) public land. Consequently, only Olympio Borja was consulted by the

---

[2]The boundary they urge would pass through the Borja home.

[3]The Declaration of former Asia Mapping surveyor Donald Bufton.

[4]However, the record indicates that the lots were in existence and belonged to private landowners prior to WWII.

surveyors, and the boundary between Lots 1930 and 1933 was drawn.[5]

## The Settlement Agreement

On June 14, 1989, two days prior to the summary judgment hearing, MPLC entered into a "Settlement Agreement" with Camacho.[6] According to the agreement, MPLC agreed to quitclaim Lot 1933 to Camacho in exchange for other property she owned. The agreement purported to grant other rights:

> Upon the execution of this agreement and recognizing that Camacho may be deemed thereafter a prospective equitable owner of Lot No. 1933, MPLC grants to Camacho the right and authority to assert MPLC's right, title, and interest, if any, to the property in dispute in Borja v. Rangamar, CA 88-203. Until a Deed of Exchange is executed, this tender of MPLC's right to Camacho is subject to the continuing supervision and approval of MPLC's legal counsel. If MPLC elects to take a different position from Camacho in the litigation, Camacho may terminate this Settlement Agreement. As long as this Settlement Agreement remains effective, Camacho shall not claim against MPLC in connection with the Borja v. Rangamar, CA 88-203, litigation.

Settlement Agreement at 2.[7] An effective period of six months from the date of execution was specified. Id. at 4. According to another provision, "if MPLC has not determined that the legal requirements for the exchange have then been met, either party may

---

[5]According to the Bufton Declaration, "[o]ur instructions from the Government were that, if there was any dispute as to the location of the boundary line, we were to give the benefit of any doubts to the private landowner." Bufton Declaration at 3. Camacho, who had no recorded interest in either Lot 1930 or 1933, was not consulted. Id.

[6]Lourdes and Luis Rangamar were not parties to the agreement.

[7]Without determining the matter, we are doubtful that MPLC, which has a duty to manage public lands for the benefit of all CNMI citizens, could legally delegate its fiduciary duty to a private party.

353

terminate this Agreement by notice in writing to the other party."[8]
Id.

## The Summary Judgment Order

The trial court granted summary judgment in favor of Borja on June 23, 1989. It first ruled that since the Rangamars had no valid interest in Lot 1933, they did not have "standing" to challenge the location of the boundary. The court briefly considered and dismissed the Settlement Agreement as a basis for standing:

> A perusal of the agreement indicates: (1) Title to lot 1933 is still unequivocally in MPLC; and (2) certain conditions and events must occur before any transfer of MPLC's interest to the defendants will transpire. As pointed out by plaintiff's counsel, the agreement is akin to "an agreement to agree."

3 CR at 895, n.1.

Next, the trial court considered MPLC's position. It found that the agency had deferred to Sketch No. 15 as delineating the proper boundary between the lots for 13 years. Because MPLC failed to present evidence genuinely disputing Borja's claim that the survey was accurate, and because the court found that Sketch No. 15 was legally conclusive as an original government survey,[9] it ruled that summary judgment for Borja was appropriate.

---

[8]The "legal requirements" appear to relate to 2 CMC § 4144, which requires exchanges of land of comparable value based on independent appraisals.

[9]Noting that Sketch No. 15 was the only government survey of the lots in question, the court cited authority for the principle that corners and lines establish by original government surveys are conclusive, and that absolute permanency is to be accorded official public land surveys. 3 CR at 898.

## ANALYSIS

### I.

The first and most significant issue in this appeal is whether MPLC genuinely disputed Borja's claim.

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U. S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986); see also Borja v. Goodman, No. 89-001 (N.M.I. June 26, 1990). If the nonmoving party fails to present a genuine dispute concerning a material fact, the trial court may properly grant summary judgment to the movant.

A grant of summary judgment is reviewed de novo. Cabrera v. Heirs of De Castro, No. 89-018 (N.M.I. June 7, 1990); Apatang v. MPLC, No. 89-013 (N.M.I. April 30, 1990). If there is no genuine issue of material fact, the analysis shifts to whether the substantive law was correctly applied. Id.

We agree with the trial court that MPLC's position at the summary judgment hearing was insufficient to meet the Anderson requirement.

It is true that MPLC denied Borja's boundary claim in its pleadings. It is also true that at the hearing, MPLC initially indicated that it joined with the Rangamar's position. TR at 33. However, counsel for MPLC then said that "[MPLC's] position is really that we're not sure where the boundary line is [and] that we

355

think the court should make a determination . . .." TR at 34. This statement was echoed in the submitted declaration of an MPLC official: "[MPLC] no longer defers to Asia Mapping Sketch No. 15 and does not definitively know where the true boundary line is . . [it] has no special reason to believe that Asia Mapping Sketch No. 15 is correct or incorrect."[10]

██ "Absent any probative evidence tending to support [a] claim, mere assertions of a dispute will not preclude summary judgment." Nuclear Regulatory Commission v. Radiation Technology, Inc., 519 F.Supp. 1266, 1293 (D.N.J. 1981). Although MPLC presented evidence indicating that the survey was not necessarily accurate, it failed to present evidence to affirmatively demonstrate that the boundary was other than as indicated in Sketch No. 15. Viewed objectively, Borja's claim that the Sketch No. 15 delineated the true boundary between Lots 1930 and 1933 was thus not genuinely disputed.

The record indicates that MPLC--the only defendant that could legally contest the survey boundary--failed to do so. Since MPLC presented no genuine dispute concerning Borja's claim, the trial court properly granted summary judgment in her favor.

## II.

The second issue is whether the Rangamars have a cognizable property interest in Lot 1933 and are a proper party to assert that interest.

██ Initially, we must determine whether the Settlement Agreement

[10] Declaration of MPLC Land Management Specialist and Senior Surveyor Jesus SN. Cabrera at 2.

356

conveyed a cognizable property interest.  Since this is a question of law, we review the matter de novo.  Loren v. E'Saipan Motors, Inc., No. 89-006 (N.M.I. April 16, 1990).

We agree with the trial court's conclusion that the Settlement Agreement conveyed no interest in Lot 1933.  Camacho and MPLC entered into what was, at most, an executory agreement for the exchange of property.[11]  The language of the document is precatory, indicating that it is indeed an "agreement to agree."  "A writing that does not on its face profess to pass title, but expressly states that title will be conveyed at a future time and upon certain conditions, is not sufficient to constitute color of title."  Shippen v. Cloer, 97 S.E.2d 563 (Ga. 1957).  The Rangamars may have had an expectancy that they would acquire the property, but the expectancy was too tenuous to permit them to assert a property right.  Cf. Cady v. Kerr, 118 P.2d 182 (Wash. 1941) (necessary defendants in a boundary dispute include all persons holding cognizable interest in the adjoining property).

Resolution of that question is not the end of the inquiry. Despite their lack of a cognizable property interest in Lot 1933, may the Rangamars nonetheless assert MPLC's interest in defending against Borja's claim?

"It is settled in a quiet title action that a defendant cannot set up title in a stranger to defeat the claim."  Hana Ranch v. Kanakaole, 623 P.2d 885, 888 (Haw.Ct.App. 1981).  The Rangamars

---

[11]We note that the six-month effective period specified in the contract expired in January, 1990.

357

thus cannot assert MPLC's interest in defending against the quiet title action.

Conversely, in some circumstances a defendant in an ejectment action can assert a third party's interest as a defense. "The general rule is that a defendant who is in possession under color of title or right may avail himself of an outstanding title in a third person as a defense, notwithstanding he does not connect himself in any way with such outstanding title . . .." 28 C.J.S. Ejectment § 39 (1941). However, in this action the Rangamars are not in possession under color of title or right and cannot assert MPLC's interest. Since the Settlement Agreement conveyed no cognizable property interest to Camacho, and because it is otherwise clear that she holds no interest in Lot 1933,[12] she may properly be described as a trespasser.[13] Likewise, since any right that Lourdes and Luis Rangamar have to the property derives from Camacho, they also lack any cognizable interest and may also be labeled trespassers. The record does not adequately support a contrary conclusion.[14]

---

[12]We take judicial notice of the 1979 Trust Territory High Court judgment on this point. See Lakin Cattle Co. v. Engelthaler, 419 P.2d 66 (Ariz. 1966).

[13]"A trespasser is one who enters the premises of another without invitation or permission, express or implied, but goes, rather, for his own purposes or convenience, and not in performance of a duty to the owner or one in possession of the premises." Johnson v. Schafer, 735 P.2d 419, 421 (Wa.App. 1987). Camacho was, in effect, adjudged a trespasser by the Trust Territory High Court in 1979.

[14]The Rangamars make no claim that they have acquired title to Lot 1930 by adverse possession. We note that they could not make such a claim to Lot 1933 because title to public property cannot be

358

■ "A defendant who is a mere trespasser or intruder cannot set up title in a third person to defeat recovery, for where a person intrudes without claim of right, upon the actual possession of another, there is reason in compelling him to restore the possession before he is permitted to show title in a third person . . .." Id. See also Lathem v. Lee, 32 So.2d 211, 214 (Ala. 1947) ("a bare, naked trespasser . . . is not permitted to show an outstanding title in a third person in order to defeat the plaintiff's recovery"); French v. Golston, 100 P.2d 581, 583 (Colo. 1940) ("[t]he defense of title in a third person is not available to a mere intruder"); and Randolph v. Hinck, 123 N.E. 273, 275 (Ill. 1919) (defendant "being a mere trespasser and without title . . . cannot set up an outstanding title in another").

The Rangamars were thus precluded from contesting Borja's boundary claim. Only MPLC could do so--and, as noted above, it failed to do so.

■ Although the trial court correctly ruled that the Rangamars lacked a cognizable property interest that would permit them to contest Borja's boundary claim, its description of that interest as "standing" is somewhat confusing. "Standing" or "standing to sue"

---

acquired by adverse possession. 3 Am.Jur.2d Adverse Possession § 268 (1986). The contention was raised in oral argument that if the Settlement Agreement conveyed no property interest, the Rangamars may be seen as "tenants at sufferance." A tenant at sufferance is one who after rightfully being in possession of rented premises continues after his right has terminated. Brach v. Amoco Oil Co., 570 F.Supp. 1437 (N.D.Ill. 1985). Even if this designation implied rights in the property--which it does not--the Rangamars do not meet the definition. From the time that they moved onto Lot 1933 in the late 1960s, the Rangamars were never rightfully in possession of the premises.

is, generally, "a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court." Black's Law Dictionary 1260 (5th ed. 1979). Further, "[t]he purpose of the law of standing is to protect against improper plaintiffs." K. Davis Administrative Law Text 427 (1972) (emphasis added).

The Rangamars, defendants in this action, are precluded from asserting MPLC's title as a defense. The trial court concluded that this was so because they lacked standing. We, however, believe that they cannot assert MPLC's title because they are trespassers, and are thus legally precluded from asserting the interest of a third party as a defense in an ejectment action.

### III.

The third and final issue is whether Asia Mapping Sketch No. 15 is legally conclusive as an "original government survey."

The trial court ruled that Sketch No. 15 is the original government survey of Lots 1930 and 1933. An "original government survey" conclusively locates the corners and lines of a lot. Therefore, it may not be challenged in court.

We need not address this issue, because regardless of whether Sketch No. 15 conclusively establishes the boundaries of the lots, it was the only evidence before the trial court at the summary judgment hearing.[15] The Rangamars could not present evidence to

_____

[15]We are uncertain, however, whether Sketch No. 15 is an "original government survey." It appears, instead, to be a resurvey intended to re-establish boundaries because both lots existed prior to WWII and belonged to private landowners then.

rebut Sketch No. 15 because they lacked a cognizable property interest (or color of title or right) that would permit them to contest Borja's boundary claim. MPLC, which had the right to contest the boundary, failed to present probative evidence indicating that the boundary is located elsewhere. Therefore, the trial court could properly issue summary judgment based upon Sketch No. 15 as the only probative evidence before the court. We affirm its decision for this reason, but decline to address whether Sketch No. 15 is an original government survey.

The order granting summary judgment is hereby AFFIRMED.

Dated at Saipan, MP, this 17th day of September, 1990.

_____
Jose S. Dela Cruz, Chief Justice

_____
Larry L. Hillblom, Special Judge

_____
Rexford C. Kosack, Special Judge

---

Sketch No. 15 was not prepared until the mid-1970s. Bufton Declaration at 2. The facts that it was the only survey of record, that it was commissioned by the Trust Territory Government, and that it established new monuments to replace missing monuments does not necessarily make it an "original government survey."